Angelo J. Calfo [WSBA No. 27079]
Patricia A. Eakes [WSBA No. 18888]
CALFO HARRIGAN LEYH & EAKES LLP
999 Third Avenue, Suite 4400
Seattle, WA 98104
Telephone No. (206) 623-1700
Fax No. (206) 623-8717

*Attorneys for Douglas L. Swenson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| UNITED STATES OF AMERICA, | NO. CR 13-0091-S BLW |
|---|---|
| Plaintiff, | DEFENDANT DOUGLAS L. SWENSON'S FORFEITURE-HEARING PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| v. | |
| DOUGLAS L. SWENSON, et al., | |
| Defendants. | |

## I. INTRODUCTION

This forfeiture proceeding represents an effort by the government to obtain a money judgment of hundreds of millions of dollars against defendant Douglas S. Swenson, an impecunious, 66 year-old individual whose decades-old business failed in the wake of the great recession of September 2008. Notwithstanding the government's devotion of substantial resources to seeking a money judgment, the government is fully aware that Douglas Swenson has no funds with which to pay such a judgment in that amount or anything close to it. Outside of the $1.4 million the government seized from Mr. Swenson, his wife and his company Code Six LLC at the time of Indictment,[1] the government does not contend that Mr. Swenson has any

---

[1] The Court understands that the government seized this money based on the representation of IRS Special Agent Keith Tippets to the magistrate judge issuing the seizure warrant that the source of these funds were "hundreds of thousands of dollars" received in draws from DBSI "in the months before DBSI's bankruptcy" in November 2008.

1

other significant assets.[2] He does have more than $30 million dollars in judgments against him arising out of his guarantees of investor bank loans obtained in connection with the sale of property to DBSI customers. His home in which he lived for more than 25 years was foreclosed upon just before the indictment in this case, in March 2013. He will live on social security and, if he is incarcerated, he and his family will not even receive social security funds from the government while in custody.

As important, this was not a case where Mr. Swenson, the company's president and majority owner, stole away with the funds of its investors, created off-shore bank accounts to hide the proceeds of fraud or lived a high-lifestyle. While Mr. Swenson did receive significant personal distributions, they were dwarfed by the hundreds of millions in revenues the company earned and paid to its investors. The evidence showed that Mr. Swenson even reinvested money he received from the company as distributions, rather than hoarding it for himself. In fact, in many ways, Mr. Swenson acted in a way this community would want a company president to act. He used company revenues, and the funds raised from the investors, to re-invest—in this case in additional purchases of commercial real estate and in high-technology ventures—for the good of the company and those who placed their money with it. The government may disagree with Mr. Swenson's business judgment, but it cannot disagree with the fact that Mr. Swenson could never be said to have looted DBSI for his personal gain.

Under the circumstances of this, it would not be fair to impose a money judgment against Mr. Swenson for money received by DBSI but which he never received during the commission

---

The seizure warrant affidavit contains no other allegation that the seized funds were derived from DBSI-related activities. As Special Agent Brian Anderson testified at trial, this assertion to the magistrate judge was not true. The Court does not address the effect of this misstatement to the Court to obtain the seized funds in this order.
[2] The Court is also aware that Mr. Swenson contracted with his attorney to pay for his defense (including his appeal) with $1 million of the $1.4 million the government seized. The government's concession that it cannot prove that these funds are traceable to any activity demonstrates that Mr. Swenson was free to use those funds to pay for a defense to this criminal prosecution, as they are the proceeds of completely legitimate business activity.

of the crimes of conviction. As a result, the Court declines to enter a money judgment in any amount.[3]

## II. FINDINGS OF FACT[4]

1. Mr. Swenson was the President and majority owner of DBSI, a real estate company based in Boise, Idaho. The company had operated for more than 25 years before seeking bankruptcy protection in November 2008 in the wake of the Lehman Brothers crash in September 2008 and the onset of the Great Recession.

2. DBSI was a legitimate business that sold fractional interests in commercial real estate to investors seeking to shelter capital gains taxes. DBSI also offered debt instruments in private placements for investors seeking reasonable returns and desiring to invest in the speculative commercial real estate market and in high technology companies. The nature of these transactions was detailed in comprehensive private placement memoranda circulated to investors. These memoranda were reviewed by securities brokers, due diligence professionals and by investors prior to the acquisition of the securities. Investors and their securities brokers promised that they had carefully reviewed the private placement memoranda constituting the offering, and based their decision to invest on the memoranda and upon their own investigation. DBSI did not sell and illegal product, such as narcotics or contraband cigarettes, but is alleged to have sold a legal investment product in an improper manner.

3. On April 10, 2013, the United States government obtained an indictment against Mr. Swenson and his codefendants charging multiple counts of conspiracy, money laundering,

---

[3] As the Court does not impose a money judgment, it is not necessary to address the Eighth Amendment issues that would arise from the imposition of a judgment in this matter given the paucity of evidence that Mr. Swenson personally profited in amounts anywhere near those requested by the government from the crimes of conviction. In addition, it is unnecessary to address the issue that any money judgment must be proved by the government beyond a reasonable doubt, based on cases such as *Apprendi v. New Jersey*, 530 U.S. 466 (2000). [However, the defendant preserves such arguments for appeal.]
[4] [Mr. Swenson objects to each of the proposed findings of fact and conclusions of law the government identifies in its pleadings.]

securities fraud, wire fraud, mail fraud, interstate transportation of stolen property ("ITSP"), bank fraud and forfeiture. The government dismissed all bank fraud and ITSP charges prior to submission of the case to the jury. On May 17, 2013, the government obtained a Superseding Indictment adding, among other things, conspiracy to money laundering counts as Counts II and III.

4. On April 14, 2014, the jury returned a verdict of *not guilty* as to Mr. Swenson and the other defendants on charges that he conspired from on or about January 1, 2007 to October 2008 to commit securities fraud, mail fraud or wire fraud, as alleged in Count I of the Superseding Indictment. At trial the government alleged that this fraud extended back to 2004. The jury also *acquitted* Mr. Swenson of conspiring to commit money laundering as alleged in Count III. Under the money laundering charges, the government claimed that Mr. Swenson's movement of money from his personal Key Bank account and into various other accounts (as shown by Exhibit 2100 at trial) constituted money laundering under 18 U.S.C. S 1957, as well as under 18 U.S.C. S 1956(h).

5. The jury returned guilty verdicts against Mr. Swenson on the substantive wire fraud and securities counts alleged in the Superseding Indictment. While the government alleged a scheme that began in or about January 2007, the first date on which the government alleged, and the jury found, that a crime was committed was on April 18, 2008, as alleged in Count IV. All the other substantive securities fraud and wire fraud convictions posted-dated Count IV. Mr. Swenson was not convicted of any criminal charge that was alleged to have occurred prior to April 18, 2008.

6. The government asks the Court to find as fact that the jury found that all of the government's allegations in the counts of convictions were proven. The Court declines to do so.

As its verdict demonstrates, the jury rejected the government's theory of the case in significant respects.

7. In light of the jury's acquittal of Mr. Swenson on Counts I and III, the Court may reasonably conclude that jury rejected the government's theory that DBSI's business model constituted a Ponzi scheme or a fraud on investors. The government presented this theory to the jury, and relied, in part, on the testimony of Gary Bringhurst in so doing, but the jury appears to have rejected it by its verdicts acquitting the defendant of those conspiracy counts. If DBSI was a Ponzi scheme by nature, there would be no way to distinguish its operations in 2008 from prior years. The jury did so distinguish, however, finding that DBSI's operations may have constituted a fraud sometime in 2008, likely because of the deteriorating condition of the economy and DBSI in that year.

8. In light of the jury's acquittal of Mr. Swenson of Count III, the Court may also reasonably conclude that the jury found that the funds in Mr. Swenson's Key Bank account did not contain the proceeds of criminal activity. The government's theory was that the transfer of funds between the accounts identified in Exhibit 2100 constituted financial transactions in excess of $10,000 involving the proceeds of conspiracy, mail fraud, securities fraud and wire fraud. The jury acquitted Mr. Swenson of this count, thus finding that the transactions in excess of $10,000 (i.e., all transactions alleged by the government) did not represent the proceeds of criminal activity.

9. The Court also notes that it was a central argument in the government's closing that it was Mr. Swenson's decision to stop taking distributions in mid-2008, and DBSI's reduction in the salaries of others at the company, and his alleged failure to disclose that to investors, was a part of the fraud. It was uncontroverted that this decision by Mr. Swenson was

made in an effort to avoid any additional losses to the company from the economic environment in 2008. Mr. Swenson did not receive any distributions from DBSI after June 30, 2008.

10. Of the funds that Mr. Swenson actually did receive in 2008, and, in particular, after April 18, 2008, the government has offered no proof tracing the source of those funds to any fraudulent transactions. The Court has no information before it to show that the funds received by Mr. Swenson came from transactions that could be identified as fraudulent based on the evidence. In fact, the evidence showed that Mr. Swenson did not receive distributions directly from DBSI at all, but rather from a company called DBSI Investments. The Court has been provided with insufficient evidence of the source of DBSI Investment's funds to understand the source of the funds that company distributed to Mr. Swenson.

11. As noted above, the government seized approximately $1.4 million TD Ameritrade accounts in the name of Mr. Swenson, his wife and Code Six LLC. The government has conceded that it cannot prove, or will not prove, that these funds were traceable to any count of conviction. It made this admission after the jury returned its verdict, and in response to Mr. Swenson's request that the issue of the money's traceability be submitted to the jury. The government has later claimed that it could trace these funds, but it has never offered any evidence in that regard. In fact, Agent Reed testified at the evidentiary hearing that funds from DBSI that went into Mr. Swenson's Key Bank account could be traced to fraudulent activity, although he offered no documentary or summary evidence to demonstrate that allegation. Agent Reed further testified that, while he believed it would be difficult to trace funds from the Key Bank account to the funds seized, he had never put any time into that effort and could not estimate that amount of effort that would have been required to do so. He was unaware of any IRS agent even trying to do so.

### III. CONCLUSIONS OF LAW

1. The amount of any money judgment cannot exceed the amount of proceeds the defendant obtained from his criminal activity. The amount is defined by statute. *See United States v. Newman*, 659 F.3d 1235, 1239, 1243 (9th Cir. 2011). Here, as in *Newman*, the government seeks a money judgment under 18 U.S.C. § 981(a)(1)(C), the civil forfeiture statute which applies in criminal cases via 28 U.S.C. § 2461(c). Section 981(a)(1)(C) states that the following property is subject to forfeiture: "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of" wire fraud or securities fraud.[5] In cases, such as this one, involving "lawful goods or lawful services that are sold or provided in an illegal manner," the term "proceeds" means "the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services." 18 U.S.C. § 981)(a)(2)(B). Thus, the statutory provisions authorize forfeiture by money judgment of the property acquired by the defendant from the crime. *Newman*, 659 F.3d at 1243, 1245-46 (vacating and remanding for judicial determination of amount of proceeds of crime); *see also United States v. Casey*, 44 F.3d 1071, 1077 (9th Cir. 2006) ("Mandatory forfeiture is concerned … with how much [defendant] received in connection with the commissions of the crime.").

2. It is well-established that the amount of forfeiture is limited to the amount of proceeds *obtained by the criminal defendant*. *Newman*, 659 F.3d at 1243 ("proceeds" of bank robbery means the amount that defendant stole from bank; "proceeds" of fraudulently obtained loans equals the total amount of loans obtained by conspiracy); *see also United States v.*

---

[5] Forfeitable property under § 981(a)(1)(C) includes proceeds traceable to a violation of "any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title)." Section 1956(c)(7), in turn, defines "specified unlawful activity" to mean "any act or activity constituting an offense listed in section 1961(1) of this title. The list at section 1961(1) includes "section 1343 (relating to wire fraud)" and "fraud in the sale of securities." 18 U.S.C. § 1961(1)(B) & (D).

*Candelaria-Silva*, 166 F.3d 19, 42 (1st Cir. 1999) ("[T]he government is entitled to an *in personam* judgment against the defendant for the amount of money the defendant obtained as proceeds of the offense."). This is true whether the forfeiture comes in the form of a forfeiture of specific property or money judgment. *See Casey*, 44 F.3d at 1076 (noting that money judgment is not "open-ended" because "[o]nce the defendant pays over the specific amount of the proceeds received, the judgment is satisfied"); *United States v. Navarro-Ordas*, 770 F.2d 959 (11th Cir. 1985) (Congress' purpose was to ensure that the criminal was separated from the proceeds of his offense; criminal forfeiture laws allow Court to order convicted defendant to pay judgment equal to proceeds obtained from the offense regardless of what he did with profits); *see also* Stefan D. Cassella, Asset Forfeiture Law in the United States §19-4, p. 588 (2010) ("[W]hen a court enters a criminal forfeiture order in the form of a money judgment, it is simply ordering the defendant to forfeit the money that was derived from or used to commit his crime.").

       3.     That a money judgment must be limited to the amount obtained by the defendant (and/or his co-conspirators) comports with the purposes behind the criminal forfeiture laws. "The purpose of criminal forfeiture is to force guilty defendants to 'disgorge their ill-gotten gains' .... Notwithstanding our broad understanding of what property courts may order be forfeited, fundamentally, forfeiture is about losing or giving up *that* property." *United States v. Davis*, 706 F.3d 1081, 1084-85 (9th Cir. 2013) (Berzon, J. concurring) ("[I]t would seem axiomatic that one must gain or possess property before one can lose it [through forfeiture]. Put simply, *by definition* one cannot "forfeit" that which he never had in the first place."). As the Second Circuit has noted, "while the statute does not expressly identify the 'whom' that must do the acquiring that results in forfeiture, 'forfeiture' is a word generally associated with a person's losing an entitlement as a penalty for certain conduct. *Contorinis*, 692 F.3d at 145; *see also* H.R.

rep. No. 106-192, at 5 (1999) ("With the forfeiture laws, we can separate the criminal from his profits . . . thus removing the incentive others may have to commit similar crimes tomorrow.").[6] In short, the forfeiture laws require that the money judgment ordered by the Court reflect the amount of money obtained *by the defendant*.

4. The government has not shown that Mr. Swenson acquired any proceeds from the securities or wire fraud counts. The government suggests that it may seek forfeiture of the amount paid to *DBSI*; such an attempt is without legal basis given that DBSI is not a co-defendant or co-conspirator. *See Contorinis*, 692 F.3d at 147-48 (holding that district court erred in ordering defendant to forfeit money paid to fund of which he was co-manager; remanding to district court with instructions that court could not order forfeiture of total amount paid to fund, but could consider defendant's interest in salaries, bonuses, dividends, or enhanced value of equity in the fund as potential proceeds "acquired" by defendant under 18 U.S.C. § 981(a)(2)(B)).

5. Mr. Swenson was convicted of securities fraud and wire fraud, but the first date on which the jury found that any crime was committed was April 18, 2008, the date on which the crime alleged in Count IV was committed. There is no federal crime based upon the mere allegation of a "scheme to defraud"; the crime is not committed until a wire is proven to have been performed in furtherance of the offense. *United States v. Garlick*, 240 F.3d 789 (9th Cir. 2001) (the use of a wire is an essential element of a federal fraud offense and each such use is a separate criminal violation); *United States v. Lazarenko*, 564 F.3d 1026, 1038 (9th Cir. 2009) (wiring in furtherance of scheme is an essential element of each count and there must be a nexus

---

[6] As noted in *Contorinis*, this general rule—that the defendant must disgorge his ill-gotten gains—is modified somewhat by the principle that a court may order a defendant to forfeit proceeds received by others who participated jointly in the crime, provided the actions generating those proceeds were reasonably foreseeable to the defendant. 692 F.3d at 147. The government has made no showing in this regard as to Mr. Swenson's co-defendants, who were acquitted of being in a conspiracy or a scheme to defraud with Mr. Swenson in any event.

between the scheme alleged and the alleged wire performed in furtherance of it). As an example of the significance of the wiring to commission of the crime, for purposes of determining the applicability of the statute of limitations, the Court looks to the date on which the wire or use of interstate commerce occurred, not to the timing of the scheme to defraud, because the crime is not complete until a use of the wires occurs. *United States v. Barger*, 178 F.3d 844, 847-48 (7th Cir. 1999) (mail (or wire) fraud is not a continuing offense; rather, the date on which a crime is committed is measured by the date on which a mailing or wiring in furtherance of the scheme occurs). The government could have sought to bring securities fraud or other counts on dates earlier than April 18, 2008, but chose not to do so.

6. The jury's verdict did not incorporate the government's theory of the case. The jury acquitted Mr. Swenson's co-defendants of conspiracy to commit fraud, or to commit money laundering. The jury acquitted the codefendants of all of the wire fraud counts. The jury found the co-defendants not guilty of securities fraud to the extent the government's allegations claimed that they were involved in making false statements or nondisclosures, or to the extent the government claimed there was a scheme to defraud. Consequently, it is clear that the government's theory of the case is it was charged and argued to the jury was rejected in very large part by the jury.

7. As to Mr. Swenson, the Court has no clear guidance as to the scope of the securities fraud and wire fraud the jury found to have existed, other than it is clear that not all of the government's allegations were accepted. Aside from what the Court knows from the acquittals, there were no special verdict forms. The precise scope and nature of the scheme as found by the jury as to Mr. Swenson cannot be determined. What can be said is that, as of April 18, 2008, the jury believed that a scheme existed and that there was some use of interstate

10

commerce on that date that constituted completion of the crime. For that reason, any money judgment based on a theory of forfeiture must be based upon proof that after April 18, 2008, Mr. Swenson received property that was the proceeds of fraud.

8. Here, as shown above, the government has made no effort to do so. Based on the evidence at trial, it is known that Mr. Swenson discontinued taking any money from DBSI in June 2008. As a result, the only forfeitable funds would be those received by Mr. Swenson from April 18, 2008 to June 30, 2008. The government has offered no evidence to demonstrate the amount of funds received by Mr. Swenson in that time period, or that they can be traced to fraudulent transactions. Given this factual context, the government has not shown that Mr. Swenson "acquired [any money] through the illegal transactions resulting in the forfeiture." 18 U.S.C. § 981(a)(2)(B).

9. The cases cited by the government which state that the Court may order forfeiture of proceeds generated over the course of the entire scheme are inapposite. Those cases do not answer the relevant question here, which is when did the jury find that the scheme started and what was its nature and scope at the time the crime was committed (i.e., at the time the use of the wires or of interstate commerce occurred, and thus the crime complete). The Court concludes that the jury found that the nature and scope of the conspiracy was that, on or after April 18, 2008, Mr. Swenson failed to disclose that he would stop taking a draw from DBSI and was reducing the salaries of other DBSI employees—and was taking other steps to reduce costs—in order to avoid the losses the company was incurring due to the deteriorating conditions in the national economy.

10. The Court declines the government's request that it order forfeiture against Mr. Swenson for all revenues received by DBSI, or all net proceeds received by DBSI during the

period after April 18, 2008, the first date on which the jury found that a crime was committed. In cases involving "illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes," the term "proceeds" means "property of any kind obtained directly or indirectly, as a result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A). But courts have held that securities and wire fraud fall under § 981(a)(2)(B). *United States v. Mahaffy*, 693 F.3d 113, 137-38 (2d Cir. 2012) (holding that scheme involving purchase and sale of securities was a lawful service sold in an unlawful manner under § 981(a)(2)(B)); *United States v. Nacchio*, 573 F.3d 1062, 1088-89 (10th Cir. 2009) (insider trading involves lawful goods sold in an illegal manner); *United States v. Kalish*, No. 06-cr-656, 2009 WL 130215, at *6-7 (S.D.N.Y. Jan. 13, 2009) (advanced fee scheme engaged in by unlicensed entity in violation of mail and wire fraud statutes is "lawful service provided in an illegal manner" under § 981(a)(2)(B)).

11. As to the government's net proceeds theory, the Court declines the government's request for two reasons. First, there has been insufficient proof offered by the government to show that there were net proceeds from the alleged offense. Indeed, the government has consistently claimed that DBSI's group of companies was "universally unprofitable." The government repeated made this argument to the jury and has represented the same to the Court in these forfeiture proceedings. And for the year 2008, the financial statement for DBSI housing showed a close to $10 million loss. Additional losses from the companies' subsidiaries, such as Stellar Technologies, were not included on that financial statement (as the government argued to the jury). The government cannot turn around in these forfeiture proceedings and claim that DBSI received tens of millions of dollars in net proceeds from its businesses in light of these

12

facts. There were no net proceeds from the crimes of conviction, according to the government's very theory of the case.

12. A second reason the Court declines to order forfeiture of gross revenues or net proceeds is that the government's proof in these forfeiture proceedings has not shown that DBSI had no independent existence from Mr. Swenson himself and was thus his "alter ego." The evidence at trial showed that DBSI had owners other than Mr. Swenson; there were other members of the board of directors of the DBSI companies; and that management of the company was not alone vested in Mr. Swenson. There is no evidence that DBSI did not scrupulously observe corporate formalities. The evidence did show that Mr. Swenson exercised significant control over DBSI and was responsible for key decisions the company made. This, however, does not translate into a finding that Mr. Swenson and DBSI were "alter egos" of each other. There is not sufficient similarity between Mr. Swenson and DBSI such that all funds received by DBSI should be attributed to Mr. Swenson. And when the Court looks to the evidence on how such funds were distributed, the money received by DBSI was not given to Mr. Swenson but was for the most part re-invested in DBSI.

13. Even if the Court were to conclude that some amount of money judgment against defendants is appropriate, the government has failed to show that substitute assets are warranted or authorized. Substitute assets are governed by 21 U.S.C. § 853(p). That statutory provision provides in relevant part:

(p) Forfeiture of substitute property

    (1) In general

    Paragraph (2) of this subsection shall apply, if any property described in subsection (a) of this section, *as a result of any act or omission of the defendant*—

        (A) cannot be located upon the exercise of due diligence;

(B) has been transferred or sold to, or deposited with, a third party;

(C) has been placed beyond the jurisdiction of the court;

(D) has been substantially diminished in value; or

(E) *has been commingled with other property which cannot be divided without difficulty.*

(2) Substitute property

In any case described in any of subparagraphs (A) through (E) of paragraph (1), the court shall order the forfeiture of any other property of the defendant, up to the value of any property described in subparagraphs (A) through (E) of paragraph (1), as applicable.

21 U.S.C. § 853(p) (emphasis added). Paragraph (a) defines "Property subject to criminal forfeiture" as (1) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation.[7]

14. Here, the government seized $1.4 million of assets from TD Ameritrade accounts, and claims that the source of those funds was Key Bank accounts into which fraudulent proceeds were deposited. The government claims that it would not be able to trace the funds in the TD Ameritrade accounts, and that the funds should therefore be forfeited as substitute assets. The government's proof in this regard is lacking. While Agent Reed testified that it would be difficult to trace these funds, he also was unable to identify any effort by the government to conduct a tracing analysis. He stated that there may have been legitimate funds commingled with tainted funds in the relevant accounts, but could not testify that this was so. He claimed the difficulties in tracing arose from the fact that there were several bank accounts, and that direct tracing of only tainted funds would be required. Given that Agent Reed could not actually testify that legitimate funds were included in the accounts that needed to be traced, it is not possible to

---

[7] Paragraph (a) contains other definitions of property subject to forfeiture not applicable here.

credit his testimony in this regard. Agent Reed having failed to testify about any effort to actually conduct the tracing analysis, the Court is left without information about how many bank accounts would actually have been involved and how difficult a tracing analysis would be. Agent Reed could not testify as to how many hours it would have likely taken to conduct the tracing analysis, though he did testify that if enough effort was employed, it could be done. The Court cannot conclude that tracing would have been difficult without significantly more proof offered by the government on this issue.

15. In addition, substitute assets are only allowed when the government has shown that directly forfeitable property is unavailable because of some act or omission of the defendant. The government has made no such showing here and therefore has not satisfied the requirements of § 853(p)(1)(a). As such, no order regarding substitute assets (including, for example, seizure of substitute assets) should issue.[8]

DATED this 23rd day of June, 2014.

                                                        *s/Angelo J. Calfo*
                                           Angelo J. Calfo [WSBA No. 27079]
                                           Patricia A. Eakes [WSBA No. 18888]
                                           CALFO HARRIGAN LEYH & EAKES LLP
                                           999 Third Avenue, Suite 4400
                                           Seattle, WA 98104
                                           Telephone: (206) 623-1700
                                           Email: angeloc@calfoharrigan.com
                                                       pattye@calfoharrigan.com

                                           *Attorneys for Defendant Douglas Swenson*

---

[8] Regardless, seizure of substitute assets is prohibited in the Ninth Circuit prior to conviction. *See United States v. Ripinsky*, 20 F.3d 359, 363 (9th Cir. 1994). It would be inappropriate to permit the government to forfeit assets it illegally seized.

CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of June, 2014, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

| | |
|---|---|
| Anthony G. Hall | Anthony.Hall@usdoj.gov |
| Raymond E. Patricco | Raymond.Patricco@usdoj.gov |
| Justin D. Whatcott | Justin.Whatcott@usdoj.gov |
| Mark L. Williams | Mark.L.Williams@usdoj.gov |
| Joshua David Hurwit | joshua.hurwit@usdoj.gov |
| Wendy Olson | wendy.olson@usdoj.gov |
| Kathrine Wong | katherine.wong@usdoj.gov |
| Syrena Hargrove | syrena.hargrove@usdoj.gov |
| George William Breitsameter | gwbreitsameter@gmail.com |
| John Robert Kormanik | jrk@khsidaholaw.com |
| David Z. Nevin | dnevin@nbmlaw.com |
| Jeffery P. Robinson | robinson@sgb-law.com |
| Greg S. Silvey | greg@idahoappeals.com |
| Kira Dale Pfisterer | kdp@hepworthlaw.com |

DATED this 23rd day of June, 2014.

*s/Susie Clifford*