UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>v.<br><br>DOUGLAS L. SWENSON, *et al.*,<br><br>      Defendants. | Case No. 1:13-CR-91-BLW<br><br>**AMENDED FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER** |

## INTRODUCTION

The Court has before it the Government's Motion for Preliminary Order of Forfeiture (Dkt. 517). The Court has already entered stipulated orders of forfeiture for defendants Mark Ellison, David Swenson and Jeremy Swenson. Thus, the pending motion relates only to defendant Doug Swenson. The Court conducted a forfeiture hearing on June 9, 2014. The parties subsequently filed their proposed findings of fact and conclusions of law, and the Court now enters its Findings of Fact, Conclusions of Law, and Order.

## BACKGROUND

Defendant Doug Swenson was charged with, and convicted of, 34 counts of wire fraud, in violation of 18 U.S.C. § 1343, and 44 counts of securities fraud, in violation of 15 U.S.C. § § 78j(b) and 78ff. He was acquitted of 1 count of conspiracy to commit securities fraud, wire fraud or mail fraud, and 1 count of conspiracy to commit money laundering.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER – **page 1**

In the Superseding Indictment, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, the Government notified Swenson that it would seek forfeiture of at least $169 million in U.S. currency if he was convicted of the offenses alleged in the Superseding Indictment. *Superseding Indictment*, ¶ 225, Dkt. 21. The Government also notified Swenson that upon conviction it would seek forfeiture of funds within various TD Ameritrade accounts that it had seized pretrial, and that it would seek substitute assets up to the amount of the forfeiture money judgment pursuant to 21 U.S.C. § 853(p). *Id.*

Upon return of the jury's verdict convicting Swenson of the wire and securities fraud counts, the Government notified the Court and Swenson that it would seek forfeiture of the TD Ameritrade accounts as substitute assets. The Government then filed its pending Motion for Preliminary Order of Forfeiture, seeking a forfeiture money judgment of $169 million and forfeiture of the seized TD Ameritrade account funds as substitute assets.

## CONCLUSIONS OF LAW

1.    Title 18, United States Code, Section 981 provides for the forfeiture of certain property to the United States.

2.    Section 981(a)(1)(C) provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in Section 1956(c)(7) of this title) . . . ."

3.    Title 18, United States Code, Section 1956(c)(7) lists offenses constituting "specified unlawful activity."

4.    These offenses include "any act or activity constituting an offense listed in section 1961(1) of this title . . ." 18 U.S.C. § 1956(c)(7)(A).

5.    Title 18, United States Code, Section 1961(1) lists offenses including "(B) any act which is indictable under any of the following provisions of title 18, United States Code. . . section 1341 (relating to wire fraud)," and "(D) any offense involving . . . fraud in the sale of securities . . . ."

6.    Title 28, United States Code, Section 2461(c) permits the government to seek criminal forfeiture whenever civil forfeiture is available and the defendant is found guilty of an applicable offense. *United States v. Newman*, 659 F.3d 1235, 1239 (9th Cir. 2011).

7.    Section 2461(c) states that "[i]f a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case pursuant to the Federal Rules of Criminal Procedure and section 3554 of title 18, United States Code."

8.    Section 2461(c) generally incorporates the forfeiture procedures codified in Title 21, United States Code, Section 853.

9. Accordingly, the 34 counts of wire fraud and 44 counts of securities fraud of which Swenson was convicted qualify as applicable offenses for criminal forfeiture.

10. Rule 32.2 of the Federal Rules of Criminal Procedure and Title 21, United States Code, Section 853 govern the criminal forfeiture process. *United States v. Lazarenko*, 476 F.3d 642, 648 (9th Cir. 2007).

11. "Criminal forfeiture provisions operate *in personam* against the assets of the defendant and serve as part of the penalty for the defendant's conviction." *United States v. Nava*, 404 F.3d 1119, 1124 (9th Cir. 2004) (citing 18 U.S.C. § 1963 & 21 U.S.C. § 853).

12. "Criminal forfeiture reaches any property involved in the offense or any property traceable as proceeds to it." *United States v. Lazarenko*, 476 F.3d 642, 647 (9th Cir. 2007) (citing 18 U.S.C. § 982(a)(1)).

13. Criminal forfeiture occurs in two stages.

14. First, the defendant's interest in property is forfeited in a preliminary order of forfeiture as part of sentencing. At this first stage questions of property ownership are not addressed. *See Lazarenko*, 476 F.3d at 648. Criminal Rule 32.2(b)(4)(A) provides that the forfeiture of the defendant's interest in the property becomes final at sentencing, but the order is preliminary as to any third party interests. *Id*.

15. Second, the United States must notify the public of its preliminary order of forfeiture and give all potential claimants an opportunity to assert their alleged interest in the property. *Id*. The process for adjudicating any third party's claim of

interest in property is governed by 21 U.S.C. § 853(n). *Id*. In this ancillary proceeding, "the sole legal issue before the court is the ownership interests of the competing parties." *Nava*, 404 F.3d at 1124 (internal quotation and citation omitted).

16.     Rule 32.2 "makes clear that, at least where the proceeds of criminal activity are money, the government may seek a money judgment as a form of criminal forfeiture." *Newman*, 659 F.3d at 1240.

17.     Specifically, Rule 32.2(b)(1)(A) states that "[a]s soon as practical after a verdict or finding of guilty . . . on any count in an indictment . . . regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute. If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense. If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay." See also 28 U.S.C. § 2461(c) (providing that "the court shall order the forfeiture of property as part of the sentence in the criminal case pursuant [to] the Federal Rules of Criminal Procedure.").

18.     As to the amount of the money judgment, "[t]he statute mandates that a defendant forfeit a very specific amount – the proceeds of his criminal activity," or in other words, the amount "he received in connection with the commission of the crime." *United States v. Casey*, 444 F.3d 1071, 1076 (9th Cir. 2006).

19.     The purpose is to "eliminate the gains realized from criminal activity." *Id*. at 1074.

20. The term "proceeds" subject to forfeiture is defined in two ways in Title 18, United States Code, Section 981(a)(2).

21. Section 981(a)(2) provides, in part:

> (A) In cases involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes, the term "proceeds" means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense.

> (B) In cases involving lawful goods or lawful services that are sold or provided in an illegal manner, the term "proceeds" means the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services. The claimant shall have the burden of proof with respect to the issue of direct costs. The direct costs shall not include any part of the overhead expenses of the entity providing the goods or services, or any part of the income taxes paid by the entity. 18 U.S.C. § 981(a)(2).

22. Generally, proceeds are limited to funds involved in the offenses of conviction, and should not be based on uncharged or acquitted conduct. *See United States v. Nava*, 404 F.3d 1119, 1129 n. 5 (9th Cir. 2005); *United States v. Garcia-Gu*izar, 160 F.3d 511, 524-25 (9th Cir. 1996).

23. However, for offenses charging a "scheme or artifice," the court may forfeit proceeds generated over the course of the entire scheme, not just by the particular executions of it charged in the counts of conviction. *United States v. Pe*na, 380 Fed. App'x 623, 626-27 (9th Cir. 2010).

24. A defendant may obtain proceeds "directly or indirectly" as a result of his crime. 18 U.S.C. § 981(a)(2)(A).

25. Accordingly, proceeds are not limited to the funds the defendant personally received, but include all of the funds he obtained indirectly through business entities he controlled or that served as his "alter ego." *United States v. Contorinis*, 692 F.3d 136, 147 (2d Cir. 2012); *see also United States v. Peters*, 257 F.R.D. 377, 381, 384 (W.D.N.Y. 2009).

26. A corporation is the defendant's alter ego if he (1) exercised such complete control that the corporation had no separate will of its own; and (2) this control was used to commit a wrong. *Peters*, 257 F.R.D. at 384-85 (citing cases). "Control over the entirety of the corporation's business need not be proven, rather, domination over the transaction attacked [is] sufficient." *Id*. at 385.

27. A defendant is jointly and severally liable for proceeds received by those who act in concert with him. *See United States v. Roberts*, 660 F.3d 149, 165 (2d Cir. 2011).

28. In addition to a money judgment, "Rule 32(e) allows the government also to seek forfeiture of 'substitute property.'" *Newman*, 659 F.3d at 1242.

29. Rule 32.2(e) provides: "On the government's motion, the court may at any time enter an order of forfeiture or amend an existing order of forfeiture to include property that . . . (B) is substitute property that qualifies for forfeiture under an applicable statute."

30. Here, the government seeks the forfeiture of substitute assets – specifically the funds held in bank accounts held at TD Ameritrade, Inc. and seized by the government pretrial.

31. Forfeiture of substitute property is governed by Title 21, United States Code, Section 853(p).

32. Section 853(p)(1) provides for the forfeiture of substitute property if "as a result of any act or omission of the defendant [directly traceable property] (A) cannot be located upon the exercise of due diligence; (B) has been transferred or sold to, or deposited with, a third party; (C) has been placed beyond the jurisdiction of the court; (D) has been substantially diminished in value; or (E) has been commingled with other property which cannot be divided without difficulty."

33. If the government satisfies any of these requirements, forfeiture of substitute property is mandatory. 21 U.S.C. § 853(p)(2); *Newman*, 659 F.3d at 1242-43.

34. If the Court finds that property is subject to forfeiture, it must enter a preliminary order of forfeiture setting forth the amount of any money judgment or directing the forfeiture of specific property without regard to any third party interests, which are determined in an ancillary proceeding under Rule 32.2(c). Fed. R. Crim. P. 32.2(b)(2).

# FINDINGS OF FACT

35. Doug Swenson founded and operated DBSI, a conglomerate of affiliated companies that was engaged in the acquisition, development, management and sale of commercial real estate properties throughout the United States.

36. Swenson controlled virtually every aspect of DBSI's operations.

37. During 2007 and 2008, DBSI sold a range of security investments, including Tenant-In-Common ("TIC") investments in both commercial properties and bare land.

38. In 2008, DBSI also had a $90 million dollar note offering, called DBSI 2008 Notes.

39. TIC investments in commercial properties were sold to TIC investors subject to a Master Lease agreement which required DBSI to pay fixed returns to investors on a monthly basis.

40. In exchange, DBSI was entitled to all rents from the underlying properties' tenants.

41. Bare land investments were sold to investors subject to a Land Option agreement which required DBSI to pay fixed returns on a quarterly basis.

42. In exchange, DBSI received an option to buy back the bare land at a pre-determined price on a pre-determined date.

43. Under the DBSI 2008 Notes offering, investors were to receive a fixed return on their principal until the note was called or came due, at which time DBSI was

required to pay back the principal unless the investor opted to reinvest the funds back into DBSI.

44. Because each of these three investments entitled investors to receive a stream of fixed payments from DBSI into the future, sometimes for a period up to 20 years, DBSI's financial strength and ability to meet its long-term financial obligations was critical to investors and central to DBSI's marketing and sales efforts.

45. As reflected in the jury's verdict, the government established at trial that Swenson misrepresented the success, profitability, and net worth of DBSI.

46. Although not disclosed to investors, DBSI's businesses were almost entirely unprofitable and required new TIC investments to pay investor returns.

47. Throughout 2007 and 2008, DBSI obtained investments by concealing (1) Master Lease losses of more than $3 million per month, (2) the illusory nature of Master Leaseco's $15.4 million guarantee, and (3) the misappropriation of investors' accountable reserves.

48. Additionally, DBSI Housing's financials, which were included in all DBSI PPMs, represented positive net income and net worth which was the result of deceptive accounting practices directed and approved by Swenson.

49. At the forfeiture hearing, the government presented two alternate theories of forfeiture.

50. The first theory of forfeiture is based on the gross or net amount of funds DBSI obtained from investors during 2007 and 2008.

51.   However, facts presented at the trial and the forfeiture hearing do not support a finding that DBSI was selling an illegal product.

52.   Accordingly, the Court does not agree with the Government's gross amount theory.

53.   Instead, the evidence showed that DBSI was selling lawful goods in an illegal manner.

54.   By misrepresenting the success, profitability and net worth of DBSI, Swenson did not sell investors an illegal product; he sold investors lawful goods and services in an illegal manner.

55.   Thus, the Court agrees with the government's "net amount" theory which requires that the Court include direct costs in calculating the measure of proceeds. 18 U.S.C. § 981(a)(2)(B).

56.   The Court applies Swenson's ownership share of DBSI to determine his portion of these proceeds.

57.   At the Forfeiture Hearing, Swenson referenced Exhibits 5311 and 5315, DBSI Housing, Inc. Financial Statements for December 31, 2007 and June 30, 2008, respectively.

58.   Specifically, Swenson referenced DBSI Housing, Inc.'s Statement of Operations.

59.   The government does not agree that the Statement of Operations should be used as a measure of real estate sales revenues and cost of goods sold, but notes that because both figures contain extraneous sums (in an equal amount) due to lenders

for mortgages on the properties, the Court could still apply the figures contained in the Statement of Operations.

60.     The Court agrees.

61.     However, as the government suggests, and as the Court notes below, the "real estate sales" figure understates the total amount investors paid to DBSI because it does not include accountable reserves and debt (or note) investments.

62.     Therefore, the Court separately will include these amounts.

63.     In 2007, DBSI obtained $335,385,463 in "real estate sales" revenues from investors. Ex. 5311.

64.     In 2007, DBSI obtained $22,946,929 ($66,625,698 - $43,678,769) in accountable reserves from investors. Ex. 800.[1]

65.     Matt Duckett and Debbie Miller testified at trial that accountable reserves were not included in DBSI's "real estate sales" revenues because these monies belonged to TIC investors.

66.     However, the Court includes them in the calculation of proceeds because they are additional amounts investors actually paid DBSI.

---

[1] It appears the government reached this number by subtracting the Net A/R for January 2007 from the Net A/R for December 2007. The Court is not altogether clear why it should not subtract the Net A/R for December 2006 from the Net A/R for December 2007 instead. However, because the amount suggested by the government is less, and therefore favors Swenson, the Court will adopt the government's proposal. If either party believes that the numbers subtracted should have been the Net A/R for December 2006, they  may notify the Court in writing, and the Court will consider amending its findings.

67. In 2007, DBSI obtained $100,203,991 in notes investments from investors. Ex. F-2 at 32.

68. Monies for debt investments (e.g., 2008 Notes) are not included in DBSI's "real estate sales" revenues because they were akin to loans.

69. However, the Court includes them in the calculation of proceeds because they are additional amounts investors actually paid DBSI.

70. In total, in real estate sales, accountable reserves, and note offerings, DBSI obtained $458,536,383 from investors in 2007.

71. The Court does not include in this sum the following amounts on the Statement of Operations that DBSI obtained in revenue from sources other than investors: Master Lease income ($271,766,929), interest income ($828,036), real estate fund management income ($9,923,293), disposition fee income ($901,634), miscellaneous income ($6,704692). Ex. 5311.

72. In 2007, DBSI expended $319,828,280 in "costs of goods sold." Ex. 5311.

73. The Court finds that this is the proper measure of direct costs of selling the subject offerings to investors.

74. The Court does not include in the measure of direct costs the following expenses on the Statement of Operations relating to DBSI's operation of the properties after the sale to investors: property operating expenses ($90,470,311), rent expense ($81,906,606), mortgage and interest expenses ($81,907,431), overhead expenses ($31,474,982), and depreciation and amortization ($4,191,345).

75.     These expenses are more akin to "overhead" rather than "direct costs" of the investments sold, and are properly excluded. 18 U.S.C. § 981(a)(2)(B).

76.     Accordingly, in 2007, DBSI obtained $138,708,103 ($458,536,383 - $319,828,280) in net proceeds from the scheme.

77.     Applying Swenson's 88.2 percent ownership share of the company in 2007, the Court finds that Swenson personally obtained $122,340,546 of this amount.

78.     In 2008, DBSI obtained $164,575,777 in "real estate sales" revenues from investors. Ex. 5314.

79.     In 2008, DBSI obtained $6,683,223 ($73,571,194[2] – 66,887,971) in accountable reserves from investors. Ex. 800.

80.     In 2008, DBSI obtained $102,708,078 in notes investments from investors. Ex. F-1 at 28.

81.     In total, in real estate sales, accountable reserves, and note offerings, DBSI obtained $273,967,078 from investors in 2008.

82.     In 2008, DBSI expended $155,439,951 in "costs of goods sold." Ex. 5314.

---

[2] According to Ex. 800, it appears the government used the September 2008 Net A/R as the starting point for this calculation, which is lower than the November 2008 Net A/R. It then subtracted the January 2008 Net A/R. Again, the Court is not exactly sure why the government did not subtract the December 2007 Net A/R from the November 2008 Net A/R. But because the government's proposed amount is less, and therefore favors Swenson, the Court will adopt the government's proposal. If either party believes that the December 2007 Net A/R should have been subtracted, they may notify the Court in writing, and the Court will consider amending its findings.

83. Accordingly, in 2008, DBSI obtained $118,527,127 ($273,967,078 – $155,439,951) in net proceeds from the scheme.

84. Applying Swenson's 89.7 percent ownership share of the company in 2008, the Court finds that Swenson personally obtained $106,318,832 of this amount.

85. In total, for 2007 and 2008, Swenson obtained $228,659,378 ($122,340,546 + $106,318,832) in proceeds from the scheme.

86. The Court awards the government a money judgment in this amount.

87. Alternatively, if the $228,661,304 is determined to be in error on appeal, the Court agrees with the government's alternative second theory as well.

88. The second theory of forfeiture is the amount of money Swenson caused DBSI to pay him in cash distributions and to divert to Stellar Technologies, LLC and the group of technology companies beneath its umbrella.

89. In 2007 and 2008, Swenson caused DBSI to pay him $1,717,151 in salary and distributions. Ex. 1700.

90. Also in 2007 and 2008, Swenson caused DBSI to divert $61,260,064 from DBSI to Stellar Technologies, LLC.

91. As CEO, President, and 88 percent owner of DBSI, Swenson controlled DBSI and he was responsible for the decision to divert the above amounts from DBSI to Stellar.

92. According to multiple witnesses, Swenson had final say over whether and how much money DBSI transferred to Stellar.

93.    Swenson caused the transfer of this money at a time in 2007 and 2008 when DBSI needed cash and had misappropriated many millions of investors' accountable reserve funds to fund its operations.

94.    Swenson's decision to divert these funds from DBSI to Stellar personally benefitted him.

95.    While investors gave up their upside from operating the commercial properties they owned and were locked into an approximate 7 percent annual rate of return from DBSI, Swenson stood to personally gain millions if any of the Stellar companies became highly profitable because he owned a significant share of the Stellar companies.

96.    Swenson owned approximately 45 percent of Stellar, and according to Paul Judge, Swenson effectively controlled Stellar.

97.    Swenson's ownership interest in the Stellar companies is as follows:

    a.    Swenson owned 88.2% and 89.7% percent of DBSI, Inc. in 2007 and 2008 respectively. Exs. 1303 at 58; 1304 at 45.

    b.    DBSI, Inc. owned a majority interest in DBSI Investment Limited Partnership (also known as DBSI Properties). Agent Reed testified that DBSI owned approximately 54.3 percent of DBSI Investments. Independently, Swenson owned approximately 26.2 percent of DBSI Investments. Together, then, Swenson owned approximately 74 percent of DBSI Investments ((88% x 54.3% = 47.8%) + 26.2% = 74.0%).

      c.      DBSI Investments owned approximately 61 percent of Stellar Technologies, LLC. Ex. F-3. Thus, Swenson owned approximately 45 percent of Stellar (74% x 61% = 45%).

98.     As a result, Swenson stood to personally gain nearly half of all the profits of Stellar.

99.     The Court calculates the $61,260,064 diverted from DBSI to the Stellar companies as follows:

      a.      Exhibits 928, 930, and 931 establish the amounts of money transferred from DBSI to Stellar Technologies, through the entity DRR. Consistent with the trial testimony of Deborah Miller, DRR was essentially a flow through entity used to track monies moved between DBSI affiliated entities.

      b.      As of December 31, 2006, Stellar had a payable to DBSI (through DRR) totaling $80,716,935.

      c.      As found on Exhibit 928, this includes a $56,587,459 note payable, a $4,843,247[3] note payable, and accrued interest of $2,635,013 and $16,651,216.

---

[3] In its proposed findings and conclusions, the government listed this number as $4,043,247 instead of $4,843,247. The small print on Ex. 928 makes the number difficult to read. Therefore, the Court printed the document, and the number printed as $4,043,247. However, when the Court electronically enlarged the pdf exhibit, the number was $4,843,247. To resolve this discrepancy the Court noted that the sum total of the four numbers for the notes payable on the exhibit was $100,310,886.53 whether the exhibit was printed or enlarged. That total is only correct if $4,843,247 is used.

       d.      As of December 31, 2007, Stellar had a payable to DBSI (through DRR) totalling$121,653,846.

       e.      As found on Exhibit 930, this includes a $74,534,073 note payable and a $47,119,773 note payable. There is no accrued interest.

100. Thus, for the year 2007, Swenson transferred $40,936,911 from DBSI to Stellar, the difference between $121,653,846 and $80,716,935.

101. As of June 30, 2008, Stellar had notes payable to 2008 Notes totaling $24,539,964.

102. As found on Exhibit 931, this includes notes payable of $10,474,140 and $14,065,824.

103. However, Stellar had notes payable to DBSI (through DRR) totaling $117,437,035 ($80,854,073 and $36,582,962), which is $4,216,811 less than the total owed six months earlier.

104. Thus, for the first six months of 2008, Swenson transferred $20,323,153 from DBSI and the 2008 Notes to Stellar, the difference between $24,539,964 and $4,216,811.

105. Together, for 2007 and 2008, then, Swenson caused DBSI to divert a total of $61,260,064 to the technology companies ($40,936,911 + $20,323,153).

106. The Court calculates Swenson's share of these proceeds by applying his 45 percent ownership stake in Stellar.

107. The Court finds that Swenson personally obtained $18,421,609 in proceeds in 2007 (45% x $40,936,911) and $9,145,148 in 2008 (45% x $20,323,153), totaling $27,566,757.

108. Thus, the Court finds that the proper measure of proceeds is the $1,717,151 Swenson caused to be transferred to himself, added to his share of the amounts diverted from DBSI to Stellar, which is $27,566,757.

109. Together, this equals $29,283,908 in proceeds he obtained and the Court will award the United States a money judgment in this alternative amount if the Court's reliance on the "net amount" theory is found to be in error.

110. In additional to the money judgment, the Court will order the forfeiture, as substitute assets, funds seized pretrial from TD Ameritrade, Inc. accounts associated with Swenson.

111. Section 853(p) of Title 21, United States Code, provides for the forfeiture of substitute property where the government has established that property or money of the defendant which was ordered forfeited "has been transferred or sold to, or deposited with, a third party" or "has been commingled with other property which cannot be divided without difficulty."

112. In this case 21 U.S.C. §§ 853(p)(1)(A) and (E) apply and the Court will order forfeiture of substitute assets because virtually all of Swenson's fraud proceeds are no longer available for forfeiture, and those proceeds which were identified as being deposited into accounts from which the TD Ameritrade funds were in part derived had been commingled with other funds and could not be divided without great difficulty. 21 U.S.C. §§ 853(p)(2).

113.   As explained in the Court's earlier orders, before trial the government seized $1,469,491 in funds from TD Ameritrade, Inc. accounts associated with the Defendant pursuant to a seizure warrant issued by Chief Magistrate Judge Dale.

114.   In part, the warrant was premised on probable cause that the funds in the TD Ameritrade, Inc. accounts were proceeds of a conspiracy to commit money laundering, and substantive acts of money laundering, in violation of 18 U.S.C.§ 1956.

115.   In the superseding indictment, Swenson was charged in Count Three with a money laundering conspiracy, in violation of 18 U.S.C. § 1956(h).

116.   At trial, and in support of Count Three, the government introduced Exhibit 2100.

117.   Exhibit 2100 demonstrated that $1,368,365 in funds from DBSI were deposited into Swenson's Key Bank account and then routed through various Washington Mutual and TD Ameritrade, Inc. accounts in the name of Code Six, LLC and Code Six Trading.

118.   The government did not demonstrate at trial that all of the $1,368,365 was tainted funds of the underlying fraud.

119.   Nor did the government demonstrate that all of the funds routed into the Code Six accounts were tainted funds.

120.   Because the $1,368,365 contained commingled tainted and untainted funds, the government did not have to trace tainted funds dollar-for-dollar in order to prove Count Three. *United States v. Marbella*, 73 F.3d at 1516; *United States v. English*, 92 F.3d 909, 916 (9th Cir. 1996).

121. Swenson was ultimately acquitted of Count Three – the money laundering count.

122. The government still held the $1,469,491 in seized funds from the TD Ameritrade, Inc.

123. But because Swenson was not convicted of money laundering, the government had the burden to trace, dollar-for-dollar, tainted funds in from DBSI and tainted funds out to the TD Ameritrade, Inc. accounts in order to forfeit the funds therein as substitute assets.

124. At the forfeiture hearing, Special Agent Reed testified that after the acquittal on the money laundering count, the tracing of the funds – dividing commingled tainted and untainted funds and tracing tainted funds into the TD Ameritrade, Inc. accounts – could not be accomplished without significant difficulty or expenditure of time and resources. 21 U.S.C. § 853(p)(1)(E).

125. This was made a difficult and a time consuming task due to the commingling of other, non-tainted funds in the accounts which contained some of the fraud proceeds, the intervening transactions connected with stock trades, and the length of time between the 2008 deposits and the 2013 seizure.

126. The Court accordingly finds that the requirements of 21 U.S.C. § 853(p) are met, specifically subsections 853(p)(1)(B) and (E).

127. The Court finds that the difficulty of dividing tainted and untainted funds was due to an act of Swenson. 21 U.S.C. § 853(p)(1).

128. Specifically, Swenson, as President and CEO of DBSI, caused cash at DBSI to be managed on a global basis and all funds from investors (tainted funds) to be commingled with other monies of DBSI.

129. Further, Swenson caused the multiple transfers in and out of the various Washington Mutual and TD Ameritrade investment accounts – which likely contained legitimate investment income – that further complicates segregation. See Ex. 2100.

130. As a result, the Court finds that the requirements of 21 U.S.C. § 853(p)(1) have been met, and that the forfeiture of the funds seized from the TD Ameritrade, Inc. accounts is mandatory. 21 U.S.C. § 853(p)(2); *Newman*, 659 F.3d at 1242-43.

131. Pursuant to a Consent Order of Forfeiture issued by the Court, co-defendant David Swenson voluntarily forfeited to the government $94,060 of funds seized from the TD Ameritrade, Inc. account in his name.

132. Because Swenson is jointly and severally liable for forfeited property, he will be credited with this amount. *Hurley*, 63 F.3d at 23; *Cleveland*, 1997 WL 602186 at *3; *McCarroll*, 1996 WL 355371 at *9; *Saccoccia*, 62 F. Supp. 2d at 542; *Nelson*, 2012 WL 555785 at *2; *Stathakis*, 2008 WL 413782 at *16.

133. Accordingly, as to Swenson, the Court will enter a preliminary order of forfeiture for substitute assets in the amount of $1,375,431 seized from TD Ameritrade, Inc.

**ORDER**

**IT IS ORDERED:**

1.  The Government's Motion for Preliminary Order of Forfeiture (Dkt. 517) is

    **GRANTED** as explained above.

2.  The Court will grant the Government a money judgment against Douglas

    Swenson in the amount of $228,659,378 .

3.  The Court will enter a preliminary order of forfeiture for substitute assets in the

    amount of $1,375,431 for the funds seized from TD Ameritrade, Inc.

DATED: July 29, 2014

B. Lynn Winmill
Chief Judge
United States District Court