UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>       v.<br><br>DOUGLAS L. SWENSON, *et al.*,<br><br>       Defendants. | Case No. 1:13-cr-00091-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it several post-trial motions filed by the defendants. The motions are fully briefed and ready for decision. For the reasons explained below, the Court will deny the defendants' motions.

## BACKGROUND

After the government rested its case-in-chief, each of the four defendants made an oral motion for judgment of acquittal pursuant to Rule 29(a). Defendants Doug Swenson, David Swenson and Jeremy Swenson also filed a written motion for judgment of acquittal on Count 3 – conspiracy to commit money laundering. The Court denied all Rule 29(a) motions, except the motion for acquittal on Count 3. As to that count, the Court granted it as it related to the IRS refund amount deposited into Code Six accounts, and denied it on all other grounds. Dkt. 487.

On April 14, 2014, the jury returned its verdict. The jury convicted all four defendants on 44 securities fraud counts. It also convicted Doug Swenson on 34 wire

fraud counts. The jury acquitted all defendants on the sole count of conspiracy to commit fraud, and acquitted David Swenson, Jeremy Swenson and Mark Ellison on the 34 wire fraud counts. The jury also acquitted Doug Swenson, David Swenson, and Jeremy Swenson on the money laundering count.

On April 22, 2014, all four defendants filed a single Rule 29(c) and Rule 33 motion. The motion listed nine substantive issues, but was otherwise without detail. Dkt. 522. In the motion, the defendants requested the Court set a reasonable briefing schedule so they could obtain transcripts before filing their briefs. Three days later, all parties filed a stipulation regarding a briefing schedule for the motions. Dkt. 529. That schedule was slightly modified by stipulation during a status conference with the Court a few weeks later. Ultimately, by agreement, opening briefs were due June 6, 2014, response briefs were due July 7, 2014, and reply briefs were due July 14, 2014. The motions are now fully briefed and before the Court.

## LEGAL STANDARD

As noted above, all four defendants were convicted on 44 counts of securities fraud. Additionally, Doug Swenson was convicted on 34 counts of wire fraud. The elements of securities fraud are,

(1) The defendant willfully used a device or scheme to defraud someone, made an untrue statement of a material fact, failed to disclose a material fact that resulted in making the defendant's statements misleading, or engaged in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person;

(2) Acts were undertaken, the statement was made, the failure to disclose was done, or the deceptive practice was engaged in connection with the

purchase or sale of the specific security offering alleged in the count under consideration;

(3) The defendant directly or indirectly used an instrument or facility of interstate commerce or the mails, in connection with the scheme, the statement, the failure to make disclose, or the deceptive practice; and

(4) The defendant acted knowingly.

Ninth Circuit, Manual of Model Criminal Jury Instructions § 9.9. The elements of wire fraud are,

(1) The defendant knowingly participated in, devised, or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises;

(2) The statements made or facts omitted as part of the scheme were material;

(3) The defendant acted with the intent to defraud, that is, the intent to deceive or cheat; and

(4) The defendant used, or caused to be used, the wires in interstate commerce to carry out or attempt to carry out an essential part of the scheme.

Ninth Circuit, Manual of Model Criminal Jury Instructions § 8.124.

The defendants ask the Court for a judgment of acquittal of these counts under Rule 29. In resolving a Rule 29 motion, the Court "must consider the evidence presented at trial in the light most favorable to the prosecution." *U.S. v. Grasso*, 724 F.3d 1077, 1085 (9th Cir.2013). The Court "must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved . . . conflicts in favor of the prosecution, and must defer to that resolution." *Id*. at 1085–86. The Court must determine whether the

evidence, viewed in that manner, "is adequate to allow any rational trier of fact to find the essential elements of a crime beyond a reasonable doubt." *Id*.

The defendants also ask for a new trial under Rule 33. Rule 33 states that "[u]pon the defendant's motion, the Court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33(a ). The power to grant a motion for a new trial "is much broader than its power to grant a motion for judgment of acquittal." *U.S. v. Alston*, 974 F.2d 1206, 1211 (9th Cir.1992). "The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *Id*. "If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *Id*. at 1211–12.

## ANALYSIS

### I.      All Four Defendants' Motions for Acquittal or New Trial

The government presented evidence at trial sufficient to convict all four defendants of the securities fraud counts, and to convict Doug Swenson of the wire fraud counts. Below, the Court will first set forth the general nature of the evidence presented at trial, including a description of the defendants' business activities.  The evidence will then be analyzed as it relates to each defendant and to the elements of both securities fraud and wire fraud. Because some of the evidence supports more than one element of a

crime or elements of both crimes, the Court will address them together where appropriate instead of repeating itself throughout this decision.[2]

## A. Overview Of Evidence

The defendants were all principals in or employed by DBSI, or one of its subsidiaries. DBSI was primarily engaged in the marketing of Tenant-In-Common (TIC) interests in real estate – including shopping centers, apartment buildings, office buildings and raw land. The TIC interests were sold to investors who were endeavoring to make a like-kind exchange under provisions of the Internal Revenue Code which would allow them to defer taxation. The DBSI investment products were sold through private placement memoranda (PPMs) and other marketing materials. The PPMs and marketing materials contained DBSI Housing, Inc.'s financial statements and were distributed to investors. The government presented competent and substantial evidence at trial of five different misrepresentations and/or omissions contained in the marketing materials and financial statements.

### 1. Master Lease Portfolios

DBSI's marketing approach was to sell a TIC interest in the property to the investor, and then lease the property back from the TIC investors pursuant to a master

---

[2] In describing the trial evidence, the Court has relied heavily on the government's brief and its citation to the record – but only where the Court's memory agreed with the government's characterization of the evidence presented. However, in so relying, the Court has also conducted its own careful review of the trial record to ensure that the citation to the record is accurate and that the Court's description of the trial evidence corresponds with the actual trial testimony and exhibits.

lease in which the investors would be guaranteed a set return – typically 7% – on their investment. DBSI would then manage the property – keeping any profits beyond the guaranteed payment to the investors, but also subsidizing the property if it operated at a loss. As one means of assuring the investors that their guaranteed return would be paid, DBSI consolidated all of the TIC investment properties which it managed into a Master Lease Portfolio. DBSI promoted the Master Lease program as providing less risk for the investor by spreading any risk over DBSI's entire portfolio – the investor would receive his guaranteed return even if his property did not generate a positive cash flow, because the overall profitability of the portfolio backed each investor's right to a guaranteed return. However, this was only true if the Portfolio itself cash-flowed positive or broke even.

The evidence at trial established that, throughout the time period covered by the indictment, DBSI continuously represented, through PPMs and other marketing materials, that the Master Lease Portfolio was self-sustaining and profitable. However, beginning in 2005, DBSI stopped reporting to the investment community the performance of the Master Lease Portfolio because it began to cash flow negative. By 2006, the Master Lease Portfolio had losses of more than $21 million. In 2007, the losses were $38 million. These losses were so substantial, that DBSI was only able to continue functioning through the infusion of cash from the sale of new TIC Investments. These facts were not disclosed to the investment community.

### 2. Misrepresentations Concerning DBSI Master Leaseco.

DBSI, through PPMs and other marketing materials, represented that its Master Lease program was backed up by a subsidiary – DBSI Master Leaseco – which had an audited net worth of $15.4 million in cash or otherwise immediately available assets. It also represented that, although Master Leaseco could loan money to DBSI affiliates on a short-term basis of not more than 180 days, if those loans were not repaid within that period, DBSI Housing, Inc., would make an additional capital contribution to Master Leaseco in an amount equal to the unpaid loans.

The evidence at trial showed that, despite these representations, very little cash or liquid assets were maintained in Leaseco. Millions in cash were deposited into Master Leaseco's accounts at the end of each year just before the annual audit was completed. But, the bulk of that money would then be removed in early January, so that Master Leaseco had virtually no cash on hand for the remainder of the year.

### 3. Misrepresentation of DBSI's Net Worth

DBSI represented in its marketing materials that DBSI Housing, Inc., had a net worth of more than $105 million. However, the largest part of DBSI's net worth was approximately $225 million owed to it by technology companies – companies in which Defendant Doug Swenson had a substantial interest. Those loans were of questionable value since none of the technology companies had ever made a material repayment of the loan principal or interest. This questionable and very speculative asset was hidden by netting it against the monies DBSI owed to its bond and note holders, so as to show a very small netted number on its balance sheet. In essence, a very speculative asset was paired with a very real liability, so as to mask the speculative nature of the asset and

substantially overstate DBSI's actual net worth. Several DBSI accountants complained about the misleading nature of this accounting process to DBSI management, including the defendants.

### 4. Undisclosed Misuse of Accountable Reserves.

DBSI collected from investors what was called "Accountable Reserves" which the marketing materials indicated would be used exclusively for tenant improvements, leasing commissions and capital improvements – all of which were expenditures benefitting the investor's property. The marketing materials further represented that the Accountable Reserves would be repaid to the investors to the extent they were not used during the term of the lease. However, the evidence at trial showed that, contrary to the representations in the marketing materials, DBSI spent the bulk of the accountable reserve funds for DBSI's general operations, and not for tenant improvements, leasing commissions and capital expenditures on the investor's properties.

### 5. Failure to Disclose DBSI's precarious position following the FOR 1031/Spectrus Shutdown.

DBSI marketed its TIC investments through a securities channel and a real estate channel. However, the real estate channel – denominated as FOR 1031/Spectrus – generated the bulk of DBSI's sales revenues. Presumably, this was because the real estate channel was not subject to the restrictions applied to the sale of securities. In 2007, DBSI was compelled to discontinue sales through its real estate channel, unless it could obtain an exemption from the National Association of Realtors. The testimony at trial indicated that this was a real body blow to DBSI because it materially reduced its ability

to market TIC investments. And, as noted above, the negative cash flow from the Master Lease Portfolio made DBSI largely dependent on the sale of new TIC investments to maintain its financial viability. These facts were not disclosed to potential investors.

### B. Securities Fraud (Elements 1 & 4); Wire Fraud (Element 3)

The government presented evidence at trial showing that all four defendants acted willfully and knowingly in executing the fraud described above, as required to prove elements 1 and 4 of securities fraud. Some of the same evidence also supports a showing that Doug Swenson acted with intent to defraud as required by element 3 of wire fraud.

#### 1. Doug Swenson

The trial evidence showed that Doug Swenson was the President, CEO, and majority owner of DBSI. Because of his ownership stake in DBSI, while investors gave up their upside to operating the commercial properties they owned and were locked into approximately 7 percent annual rate of return from DBSI, Doug Swenson stood to personally gain millions if any of the tech companies became highly profitable because he owned a significant share of the tech companies.

Doug Swenson was ultimately responsible for every major decision at DBSI. Indeed, the evidence suggested that very few, if any, decisions were made at DBSI without his personal approval. He was present at all asset management meetings, financial statement meetings, and cash meetings. And, it was at these meetings that information was presented about the Master Lease Portfolio's negative cash flow, the problem with netting the tech company receivables, and the reduced income following

the closure of the real estate channel. He reviewed and authorized DBSI's PPMs and financial statements which misrepresented DBSI's financial state to investors.

### 2. Mark Ellison

Evidence showed that Mark Ellison was General Counsel of DBSI during the period covered by the counts of conviction. As General Counsel, he was responsible for DBSI's regulatory compliance, including those regulations applicable to the TIC offerings. Notably, Mark Ellison had authority over the language contained in PPMs and marketing materials distributed to investors. Trial Tr. at 2390-2391, Feb. 26, 2014. He was specifically warned about the "netting" problem by DBSI accountants. He was also specifically asked by those involved in managing sales activities to provide information about the performance of the Master Lease Portfolio, but claimed that he could not convince Doug Swenson to make that information available – either internally or to broker-dealers. He personally reviewed the Master Lease Portfolio Statement and, despite his knowledge of the undisclosed lack of profitability, did not prevent it from being distributed to broker-dealers. Trial Tr. at 2433-2434, Feb. 26, 2014.

### 3. David Swenson

The trial evidence established that David Swenson was an Assistant Secretary at DBSI, and had authority to bind DBSI on contracts. He was responsible for approving the Master Leases on the TIC properties. Trial Tr. at 648, 657-658, Feb. 10, 2014. He reviewed and edited the Master Lease Portfolio Statement before it was distributed to broker-dealers. Trial Tr. at 2435-2436, Feb. 26, 2014. He reviewed and commented on PPMs prior to them being finalized. Trial Tr. at 2775, Feb. 28, 2014. He had final

approval authority for Quarterly Reports distributed to investors, which described the performance of their individual properties, but not the performance of the Master Lease portfolio as a whole. Trial Tr. at 4288, Mar. 11, 2014. He was aware of specific information accumulated by investor Bill Marvel that showed that the Master Lease properties were collectively losing money. Trial Tr. At 3424-25, March 5, 2014.

### 4. Jeremy Swenson

Evidence showed that Jeremy Swenson was also an Assistant Secretary at DBSI, and that he had authority to bind DBSI on contracts. He signed as guarantor of all of DBSI's Master Lease Agreements with investors, including agreements in September of 2008. Trial Tr. at 4812-4813, Mar. 13, 2014. He was "gatekeeper" of all properties that DBSI acquired and sold. Trial Tr. at 4275-4276, Mar. 11, 2014. He calculated the amount of Accountable Reserves for each property. Trial Tr. at 4277, Mar. 11, 2014. He reviewed the Master Lease Portfolio Statement before it was distributed to broker-dealers and his opinion on it was important and needed. Trial Tr. at 4371-4372, Mar. 11, 2014. He reviewed and commented on PPMs prior to their being finalized. Trial Tr. at 2775, Feb. 28, 2014. Significantly, he directed the movement of money into Master Leaseco's account at year end, prior to the end of the audit period. Trial Tr. at 4470-4471, Mar. 12, 2014.

### 5. Meetings

Evidence showed that all four defendants attended asset management, cash, and financial statement meetings. During the asset management meetings, they learned about the poor performance of DBSI. Trial Tr. at 910, Feb. 11, 2014. But that information was

confidential, and they did not distribute this information to others, including DBSI's sales force, or the broker-dealers who represented investors. Trial Tr. at 1172-1173, Feb. 12, 2014.

The four defendants also attended weekly cash meetings. Trial Tr. at 3410-3416, Mar. 5, 2014. At the meetings, Matt Duckett and Paris Cole presented DBSI's cash position to Doug Swenson, David Swenson, Jeremy Swenson, and Gary Bringhurst. Trial Tr. at 4394, Mar. 11, 2014. Mark Ellison consciously avoided knowing the cash position of the company. Trial Tr. at 3467-3468, Mar. 5, 2014; Gary Bringhurst testified that "the conversation [between Ellison and Bringhurst about the financial position of the company] didn't continue. . . You know, my feeling was that he just didn't want to know exactly what the picture of that – the financial picture was." Cash sheets were distributed to the participants in the meeting, but were kept confidential within the company. Trial Tr. at 3975-3976, Mar. 7, 2014. The cash sheets consistently showed negative future cash flows. Trial Tr. at 4403, Mar 11, 2014.

Evidence also showed that all four defendants participated in meetings to discuss DBSI's financial statements. Trial Tr. at 3476-3477, Mar. 5, 2014. Concerns about the netting of the receivables from technology companies were raised in the meetings. Trial Tr. at 4422 Mar. 12, 2014. Each of the defendants personally reviewed PPMs containing financial statements that netted the technology company receivables and omitted material facts about the Master Lease portfolio's performance, Master Leaseco's cash balances, DBSI's use of Accountable Reserves, and the effect of the shutdown of FOR

1031/Spectrus on DBSI. Trial Tr. at 2390-2391, Feb. 26, 2014; Trial Tr. at 2775; Feb. 28, 2014.

### C.  Securities Fraud (Element 1); Wire Fraud (Elements 1 & 2)

The jury convicted Doug Swenson of the wire fraud counts, agreeing unanimously that he used a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representation, or promises. The jury convicted all four defendants of the securities fraud counts, agreeing unanimously that they engaged in an act, practice, or course of business that operates or would operate as a fraud or deceit upon any person. Additionally, as to Doug Swenson on the securities fraud counts, the jury agreed unanimously that he used a device or scheme to defraud someone, and he made an untrue statement of a material fact or failed to disclose a material fact that resulted in making the defendant's statements misleading.

Defendants Mark Ellison, David Swenson, and Jeremy Swenson take issue with the government's brief focusing on trial evidence regarding a scheme to defraud and material misstatements or omissions.  Counsel for those defendants correctly point out that the jury's verdict only convicted their clients of effectuating securities fraud by "engag[ing] in any act, practice or course of business that operates or would operate as a fraud or deceit on any person." Dkt. 502. They argue there was insufficient evidence to support a finding that they engaged in any such, "act, practice or course of business" – the only means the jury agreed upon as to them.

"The phrase 'A fraud or deceit upon any person' means, simply, a lie or a trick." O'Malley, Grenig, & Lee, § 62:10 Securities Fraud, Federal Jury Practice and

Memorandum Decision and Order – **page 13**

Instructions (6th ed. 2006). The government may meet its burden of proving a fraud or deceit by showing that it "was of a kind which would cause reasonable investors to rely and that some purchasers or sellers did rely." Id.

The evidence at trial, and addressed in the government's brief, covers the jury's findings as to all the means of effectuating the fraud. In its brief, the government suggests that it proved to the jury at least five material misrepresentations or omissions contained in the PPMs, marketing materials, and financial statements – Master Lease Portfolio, Master Leasco, DBSI net worth and netting, Accountable Reserves, and effect of FOR 1031/Spectrus shutdown. The government has variously described this conduct as constituting a "scheme to defraud" and as "false statements, misrepresentations and omissions." However, this does not mean that this same conduct cannot also constitute "acts, practices, or a course of business that operates as a fraud.." The Court finds that the evidence related to these five areas support the jury's findings as to element 1 of securities fraud for all defendants, and as to elements 1 and 2 of wire fraud as to Doug Swenson.

### 1.    Master Lease Portfolio

In PPMs and other materials, the defendants caused DBSI to represent that the Master Lease Portfolio was self-sustaining and profitable. See Ex. 201, p. 52; Ex. 203, p. 50; Ex. 206, p. 53; Ex. 208, p. 49; Ex. 210, pp. 50-51; Ex. 212, p. 51; Ex. 214, p. 52; Ex. 216, p. 50; and Ex. 218, p. 51. Trial evidence showed that these statements about the Master Lease were false and misleading. For example, witnesses testified that the Master Lease Portfolio losses put DBSI in a position where it could only survive through new

sales. Trial Tr. at 715-716, Feb 10, 2014; Trial Tr. at 3433, Mar. 5, 2014; Trial Tr. at 4440, Mar. 12, 2014.

### 2. Master Leasco

Through PPMs and other materials, the defendants caused DBSI to represent that its Master Lease program was guaranteed by Master Leaseco, which was "capitalized with $15.4 million in cash or otherwise immediately available assets." See, e.g., Ex. 203 at p. 12. Witnesses such as Debbie Miller and Gary Bringhurst testified that these representations were false or misleading. Trial Tr. at 1591-1592, Feb. 19, 2014; Trial Tr. at 1592, Feb. 19, 2014; Trial Tr. at 3475-3476, Mar. 5, 2014. Evidence showed that DBSI moved millions of dollars in and out of Master Leaseco's bank account so the audit would deceptively show that Master Leaseco had many millions in cash in its accounts at year end. Ex. 700.

### 3. DBSI Net Worth and Netting

Through PPMs and other materials, the defendants caused DBSI to represent that its Master Lease program was guaranteed by DBSI Housing, Inc., which was represented to have "a net worth of more than $105 million." See, e.g., Ex. 203 at 12; see also Ex. 104. Evidence at trial showed that this statement was misleading. Evidence showed that the largest component of DBSI Housing, Inc.'s net worth was an approximately $225 million receivable from technology companies based on monies DBSI entities transferred to them. DBSI hid this receivable by netting it against the monies owed to its bond and note holders, resulting in a small "netted" number that appeared on the balance sheet. Further, DBSI netted interest payable to bond and note holders – actually paid as an

Memorandum Decision and Order – **page 15**

expense – against interest receivable from the technology companies – only accrued, but never paid. From 1999 through 2008, none of the technology companies made a material repayment of the loan principal or interest. Evidence at trial showed that it was misleading to represent DBSI Housing Inc.'s net worth at $105 million without disclosing that its largest liability had been netted against its largest asset – a speculative investment in high tech companies. Ex. 900.

### 4. Accountable Reserves

Through PPMs and other materials, the defendants caused DBSI to represent that the "accountable reserves" that it collected for "tenant improvements, leasing commissions and capital improvements cannot be used for operations, and will be repaid to the Purchasers to the extent not used." See, e.g., Ex. 216 at 34 n.5. Evidence at trial showed that DBSI spent the bulk of the Accountable Reserve money it collected from investors on DBSI's general expenses, including operations. Ex. 800. Several witnesses also testified that Accountable Reserves primarily were used for general operations, not for tenant improvements, leasing commissions, and capital expenditures on the investors' properties. Trial Tr. at 1644, Feb. 20, 2014; Trial Tr. at 2770-2771, Feb. 28, 2014; Trial Tr. at 3500-3501, Mar. 5, 2014.

### 5. Effect of For 1031/Spectrum Shutdown

Evidence at trial showed that the defendants caused DBSI to omit from PPMs and other materials that the October 2007 shutdown of TIC sales by FOR 1031/Spectrum significantly affected DBSI's cash flow and financial stability, and that DBSI needed the National Association of Realtors ("NAR") exemption to survive. Ex. 1000.

### D. Securities Fraud (Element 2)

Evidence showed that each of the securities fraud counts involved the purchase or sale of a security. The government introduced SEC Form D's ("Notice of Sale of Securities, Pursuant to Regulation D"), and PPMs that described the offering as a security, for each of the offerings that were the subject of the securities fraud counts. Exs. 201, 203, 205, 208, 210, 212, 214, 216, 218, 219, 221, 223, 225, 227, 229, 231-235, 242, 248, and 2000-2013.

### E. Securities Fraud (Element 3); Wire Fraud (Element 4)

Evidence showed that each of the wire fraud counts involved an interstate wire, and each of the securities fraud counts involved an instrument or facility of interstate commerce. The government introduced wire records and bank statements that corresponded to the charged counts. Exs. 2501-2542. These records demonstrated that investors' funds for the subject offerings were wired across state lines.

### F. Jury Instructions

Defendant Jeremy Swenson argues, joined by at least some of the other defendants, that the Court's willfulness and mens rea instructions were erroneous.

#### a. Willfulness

Defendant Jeremy Swenson contends there has been a sea change in the definition of willfulness, which should have been applied in this case. He relies on the Solicitor General's statements in a health care fraud case suggesting that willfulness now requires proof that the defendant knew his actions were unlawful. The Court is not persuaded that

those comments somehow worked a sea change in the definition of willfulness in a securities fraud case such as this one.

The Solicitor General's position was expressly limited to health care fraud charges, brought under 18 U.S.C. §§ 1001 and 1035. *U.S. v. Ajoku*, 718 F.3d 882 (9th Cir. 2013) (cert granted, vacated and remanded by 134 S.Ct. 1872 (U.S. 4/21/2014)). That is significant, because the complex nature of health care regulations had caused some circuits to adopt the position that willfulness in health care fraud cases should be defined to require knowledge that the actions taken were unlawful. By comparison, that concern is not as pronounced in cases involving securities fraud, and there is no circuit split on the definition of willfulness in such cases. The Solicitor General's statement therefore has little applicability here.

Moreover, Ninth Circuit law, not the Solicitor General's position in a health care fraud case, controls how this Court instructs a jury in this securities fraud case. And Ninth Circuit law provides that the government need not prove a defendant knew his conduct was unlawful in a securities fraud case. *U.S. v. Tarallo*, 380 F.3d 1174 (9th Cir. 2004). The Court applied that law in its jury instructions, and no defendant objected. Accordingly, the Court's willfulness instruction was proper.

### b. Mens Rea

Defendant Jeremy Swenson contends that the Court should have repeated verbatim the phrase – engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person – within the definitions of wilfully and knowingly. By not doing so, he argues the jury instructions were confusing.

The Court disagrees. The Court properly defined willfully and knowingly in the context of securities fraud pursuant to the Ninth Circuit model jury instructions. The Court also properly instructed the jury on the separate methods for committing securities fraud. Read together, these instructions were not confusing. Moreover, no defendant objected to the instructions as confusing before they were read to the jury. Accordingly, the Court's mens rea instructions were proper.

### G. The Rule 29 and 33 Motions Will Be Denied

The evidence addressed above, taken in the light most favorable to the prosecution, was adequate to allow any rational trier of fact to find the essential elements of the securities fraud crimes as to all four defendants and wire fraud crimes as to Doug Swenson beyond a reasonable doubt. *U.S. v. Grasso*, 724 F.3d 1077, 1085-86 (9th Cir.2013). Accordingly, the Court will deny all Rule 29 motions.

Moreover, even when the Court weighs the evidence above without a presumption in favor of the government, and evaluates the credibility of the witnesses, the Court concludes that the evidence against the defendants was substantial. Certainly, the evidence against the verdict was not sufficient to suggest that a serious miscarriage of justice may have occurred. *U.S. v. Alston*, 974 F.2d 1206, 1211-12 (9th Cir.1992). Accordingly, the Court will also deny all Rule 33 motions.

## II. Doug Swenson Additional Motions

Doug Swenson also filed several separate post-trial motions based on other grounds. The Court will address each motion below.

### A. Improper Closing Argument Motion

During their closing arguments, counsel for each of the four defendants referred to

witnesses the government did not call at trial. Trial Tr. at 6967, lines 10-13; 6968, line

19-24; 6971, line 23 – 6972, line 1; 6973, line 19 – pg. 6974, line 2; 6895, line 24 – pg.

6896, line 1; 6916, lines 4 – 13; 6917, line 18 – pg. 6918, line 2; 7028, lines 1 – 12; 7058,

lines 14 – 24; 7058, line 25 – pg. 7059, line 15; 7059, line 16 – pg. 7060, line 1; and

7106, line 11 – 15, April 8, 2014. In rebuttal, government counsel stated the following,

> Additionally, you heard each defense counsel in their closing
> statement ask why the government didn't call this witness or that witness or
> that witness. The government does not need to bring in every single DBSI
> employee, every single broker-dealer, every single financial advisor, every
> single due diligence officer, every single investor for you to know that
> fraud occurred.
>
> You've heard nine weeks of evidence in this case. You don't need to
> hear nine weeks worth of evidence more to know there was a fraud. And
> even if you did, defense counsel could, of course, still point to people that
> weren't brought in.
>
> And I want to make something clear. The government has the
> burden of proof in this case, and that doesn't shift. The defense has no
> burden to call witnesses or put in evidence. But, like the government
> through this court, they have the same subpoena power to call witnesses.
> The defense can also compel almost anybody from almost anywhere to
> come here and testify on their behalf. They could have subpoenaed Bryan
> Mick and called him to the stand. They could have subpoenaed Paris Cole
> and called him to the stand. They could have subpoenaed Paul Judge and
> called him to the stand.
>
> So when they ask why the government didn't call these witnesses to
> the stand, just know that they could have called those same witnesses to the
> stand. They had that ability.
>
> Who did they call? Josh Hoffman. Now, the defendants point to Josh
> Hoffman as proof of disclosure. The same Josh Hoffman who
> recommended that the master lease language that it was losing money be
> taken out, the same Josh Hoffman who was up there saying that a company
> losing money is important but he recommended that the financials not come
> out because it wouldn't look good, the same Josh Hoffman who was
> impeached with his prior statements under oath at FINRA five years ago
> over and over and over again. Calling Josh Hoffman, ladies and gentlemen,
> just cemented what you already knew, the obvious -- that the scheme that

these four defendants operated wasn't disclosed. Not even the director of sales operations now about this. That couldn't -- that was not a surprise because his boss Merriah Harkins who you heard from didn't know about this. And the wholesalers who were working with the broker-dealers didn't know about this. And, of course, investors didn't know about this.

Trial Tr. at 7159, line 14 - pg. 7161, line 5, April 9, 2014.

Defendant Doug Swenson suggests the government's argument was improper, and asks the Court to dismiss the case or grant a new trial. Ninth Circuit law undercuts his argument. "A prosecutor's comment on a defendant's failure to call a witness does not shift the burden of proof, and is therefore permissible, so long as the prosecutor does not violate the defendant's Fifth Amendment rights by commenting on the defendant's failure to testify." *U.S. v. Cabrera*, 201 F.3d 1243, 1250 (9th Cir. 2000) (*citing U.S. v. Williams*, 990 F.2d 507, 510 (9th Cir.1993). "Additionally, where the defendant opens the door to an argument, it is 'fair advocacy' for the prosecution to enter." *U.S. v. Williams*, 990 F.2d 507, 510 (9th Cir.1993) (*quoting U.S. v. Falsia*, 724 F.2d 1339, 1342 (9th Cir.1983). "A prosecutor may properly reply to the arguments made by defense counsel, so long as the comment is not manifestly intended to call attention to the defendant's failure to testify." *Id.* (*quoting U.S. v. Bagley*, 772 F.2d 482, 494 (9th Cir.1985). Thus, where defense counsel argue that the government's decision not to call a witness is evidence of a weak case, the defense opens the door to the issue of the uncalled witness and the government may respond by pointing out that defense counsel also could have called the witness. *Id.*

Here, defense counsel opened the door to uncalled witnesses. And government counsel did not comment on any defendant's failure to testify. Moreover, both the Court

and the prosecutor reminded the jury that the government bore the burden of proof – the Court in jury instructions and the prosecutor during his rebuttal. In fact, the prosecutor reminded the jury of its burden right before he pointed out that the defendants had the same authority to call witnesses as the government, "And I want to make something clear. The government has the burden of proof in this case, and that doesn't shift. The defense has no burden to call witnesses or put in evidence." Trial Tr. at 7159, line 25 - pg. 7160, line 2, April 9, 2014. Accordingly, government counsel's closing was not improper.

### B.      Beaton Testimony Motion

On March 30, 2014, a day before the government formally rested its case in chief, the government filed a motion to exclude defendant's expert witness, Neil Beaton, from testifying. The next morning, before bringing in the jury, the Court addressed several pending matters on the record, including the motion to exclude Beaton from testifying. The Court, as it had on previous occasions, made clear to counsel the Court's interpretation of Rule 16, and the Court's intent to apply Rule 16 in deciding whether and to what extent an expert could testify. Trial Tr. at. 5988, line 24 – pg. 5992, line 6, March 31, 2014. The Court concluded its remarks by stating that it was "not making a ruling. I am just telling you how I apply Rule 16, and we'll see where it goes from there." Trial Tr. at 5991, lines 14-15, March 31, 2014.

The defendants did not call Mr. Beaton as a witness, and the case was submitted to the jury on April 9, 2014. The next day, the Court issued an order declaring the

government's motion to exclude Beaton moot because "Defendants did not call him as a witness before resting their case." Dkt. 498.

Defendant Doug Swenson now asks the Court to "permit the supplementation of the record with Defendant's supplemental expert disclosures, and to grant a new trial based on the Court's erroneous ruling on the government's motion in limine to exclude Mr. Beaton's testimony." He states that his motion is based upon the Court erroneously granting the government's motion to exclude Beaton from testifying.

The Court did not grant the motion; the Court ruled the motion moot. Dkt. 498. Before that, the Court gave counsel its interpretation of Rule 16 and how it would be applied to expert testimony. After giving its explanation, the Court specifically indicated that it was "not making a ruling." Trial Tr. at 5991, line 14, March 31, 2014. To which counsel for Doug Swenson replied by asking for oral argument on the pending motion – "I would ask for 10 or 15 minutes of argument . . . ." Trial Tr. at 5991, lines 16-17, March 31, 2014. The Court then gave another brief explanation of how it would apply Rule 16, and counsel for Doug Swenson again stated his request for argument – "Well, I would like some time for argument, Your Honor." Trial Tr. at 5992, lines 2-3, March 31, 2014. The Court responded, "Certainly." Trial Tr. at 5992, lines 4, March 31, 2014. The Court then took a recess before bringing in the jury to continue with the trial.

The defendants chose not to make the oral argument requested by defense counsel, and they chose not to call Mr. Beaton as a witness. That is why the Court deemed the government's motion moot. A motion for new trial based upon an allegedly erroneous

ruling the Court never made obviously has no merit. Accordingly, the motion will be denied.

### C.    Outrageous Government Conduct Motion

Doug Swenson asks the Court to dismiss the case against him based on outrageous government conduct. Specifically, he wants the Court to dismiss the case against him based upon what he asserts was a false affidavit submitted by a government agent to the Magistrate Judge in support of the seizure warrant. He suggests the problem was compounded because he was denied a fair pretrial hearing to challenge the government's seizure of the funds. In turn, he suggests he could not use the funds to provide him with "further resources to develop a defense to the case." *Def. Br.,* p.4, Dkt. 551.

Outrageous government conduct is conduct which "violates due process in such a way that it is so grossly shocking and so outrageous as to violate the universal sense of justice." *U.S. v. Stinson*, 647 F.3d 1196, 1209 (9th Cir.2011) (internal citation and quotation marks omitted). "The defense is therefore limited to extreme cases in which the government's conduct violates fundamental fairness." *Id.* (internal quotation and citation omitted). In short, "a defendant must meet an extremely high standard." *U.S. v. Nobari,* 574 F.3d 1065, 1081 (9th Cir. 2009) (internal citation omitted).

The Court has been down this road before. Pre-trial, the Court denied Swenson's request for an automatic evidentiary hearing to contest the validity of the seizure warrant under *Crozier-Roth* and Federal Rule of Civil Procedure 65. The Court also indicated that it would limit any evidentiary hearing to the traceability of assets if Swenson had not asserted a Sixth Amendment claim. But the Court stated that Swenson notify the Court if

he was making a Sixth Amendment claim, and that he could pursue an interlocutory appeal to the Ninth Circuit if he disagreed with the Court's ruling. Swenson did neither. Accordingly, if there was an issue with the seizure warrant, Swenson, not the Court, compounded the issue by not moving forward on the matter before trial. The issue is explained in detail in the Court's pretrial Memorandum Decision and Order addressing Swenson's Motion for *Crozier-Roth* Hearing. Dkt. 197.

Even if Swenson's allegation is true – that an agent misled the Magistrate Judge by stating that Swenson was depositing hundreds of thousands of dollars in draws on DBSI accounts into a Key Bank account during the months preceding October 2008, and that the funds were traceable to fraudulently obtained investor money – the conduct is not the type which constitutes outrageous government conduct warranting dismissal of the case. Even if the alleged conduct occurred, which this Court has not found, the remedy would be reflected in the forfeiture proceeding not in dismissing the case.

Moreover, Swenson's argument that the government prevented him from obtaining further resources to develop a defense to the case by fraudulently seizing the funds is not supported by the record. First, the Court has already determined that the funds were not fraudulently obtained. Dkts. 542 & 654. Second, the Court cannot dismiss a case unless there is prejudice. "[T]he proper prejudice inquiry is whether the government conduct had at least some impact on the verdict and thus redounded to [the defendant's] prejudice. *U.S. v. Ross,* 372 F.3d 1097, 1110 (9th Cir. 2004). Swenson was represented by two very seasoned attorneys through the pre-trial and trial proceedings. According to time sheets submitted to the Court on Swenson's Rule 41 motion, several

attorneys, paralegals and other legal support members spent thousands of hours

representing Swenson. He also hired several expert witnesses. In fact, this Court, having

sat through the trial and presided over all pre-trial matters, has first-hand knowledge of

the thorough representation Swenson has received in this case. The transcripts and docket

themselves bear this out, and a comparison of the work done on behalf of Doug Swenson

compared to his three co-defendants illustrates the complete defense he received.

Accordingly, the Court finds that the government's conduct, even if it has been fairly

described by defendant Doug Swenson, had no impact on the verdict. Thus, Swenson was

not prejudiced, and the Court will deny the motion.

### D.       Reciprocal Discovery Motion

Doug Swenson asks the Court to dismiss the case against him or grant a new trial

based upon the Court's earlier ruling requiring reciprocal discovery. Swenson is

essentially replowing the same ground covered both before and during trial. Moreover,

the Court's February 10, 2014 written opinion explains in detail the Court's reasoning for

why the Court ordered reciprocal discovery. The Court will briefly restate its reasoning

here, but also point the parties to that earlier opinion, Dkt. 357, for a more detailed

explanation.

Rule 16 provides for a defendant's disclosure of documents and objects by stating

that if a defendant requests disclosure under Rule 16(a)(1)(E), and the government

complies with that request, the defendant must disclose items within his possession,

custody, or control if he wants to use them in his case-in-chief. Fed. R. Crim. P. 16

(b)(1)(A). A defendant's failure to comply with discovery obligations may result in

exclusion of the undisclosed evidence. Fed. R. Crim. P. 16(d)(2)(C). *See also U. S. v. Sholl*, 166 F.3d 964, 972 (9th Cir. 1999); *U. S. v. Aceves-Rosales*, 832 F.2d 1155, 1156-57 (9th Cir. 1987).

As discussed in more detail in the Court's earlier opinion, the Court adopted the holding in *U.S. v. Hsia,* 2000 WL 195067 (D.C. Cir. Jan. 21, 2000) as to what constitutes a defendant's case-in-chief. *Hsia* found that if the prerequisites of Rule 16(b)(1)(A) are satisfied, defendants have a duty to produce any exhibits they intend to use at trial during cross examination of a government witness other than for impeachment purposes. *U.S. v. Hsia,* 2000 WL 195067 (D.C. Cir. Jan. 21, 2000). The Court applied that standard during trial – sometimes even more lenient on defendants than warranted. Swenson's request that the Court now dismiss the case or grant a new trial for applying that standard is without merit and denied.

## ORDER

**IT IS ORDERED:**

1. Defendants' Motion for Relief Pursuant to Fed. R. Crim. P. 29(c) and 33 (Dkt. 522) is **DENIED**.

2. Douglas Swenson's Motion for Judgment of Acquittal Pursuant to Federal Rule of Criminal Procedure 29 (Dkt. 544) is **DENIED**.

3. Defendant David Swenson's Motion for Relief Pursuant to Fed. R. Crim. P. . 29(c) and 33 (Dkt. 545) is **DENIED**.

4. Defendant Douglas L. Swenson's Motion to Supplement Record and for a New Trial Regarding court's Ruling on Government Motion to Exclude Neal Beaton Testimony (Dkt. 546) is **DENIED**.

5. Defendant Jeremy Swenson's Rule 29 and 33 Motion (Dkt. 547) is **DENIED**.

6. Defendant Douglas L. Swenson's Joinder in Rule 29 and 33 Motions Filed by Jeremy Swenson (Dkt. 548) is **DENIED**.

7. Defendant Douglas L. Swenson's Motion for Dismissal of the Indictment with Prejudice or in the Alternative for a New Trial Pursuant to Rule 33 (Dkt. 549) is **DENIED**.

8. Defendant Douglas L. Swenson's Motion to Dismiss or for a New Trial Based on Improper Government Closing Argument (Dkt. 550) is **DENIED**.

9. Defendant Mark Ellison's Motion for Relief Pursuant to Fed. R. Crim. P. 29(c) and 33 (Dkt. 554) is **DENEID**.

10. Government's Motion for Authorization to File an Overlength Brief (Dkt. 626) is **GRANTED**.

11. Defendant Jeremy Swenson's Motion for Leave to File an Overlength Reply Brief (Dkt. 639) is **GRANTED**.

DATED: August 15, 2014

B. Lynn Winmill
Chief Judge
United States District Court