UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DOUGLAS L. SWENSON,<br><br>Defendant. | Case No. 1:13-cr-00091-BLW-1<br><br>**MEMORANDUM DECISION**<br>**AND ORDER** |

**INTRODUCTION**

Douglas L. Swenson has filed a Motion for Reduction of Sentence on compassionate release grounds, with supplementation. Dkts. 1105, 1109, 1111, 1117. The Government opposes the motion. Dkt. 1114. For the reasons stated below, the Court will grant the motion and reduce Swenson's 20-year sentence to 17 years subject to the following conditions: that he complete the remainder of the 17 years in home detention under a new term of supervised release; that he thereafter complete the 3-year original term of supervised release set forth in his Judgment of Conviction (Dkt. 723); that, as his health permits, he find work and pay restitution to his victims; that his United States Probation Services supervisor ensure that any job he undertakes does not provide him with opportunity to commit

MEMORANDUM DECISION AND ORDER - 1

the same type of criminal actions for which he is currently imprisoned;[1] and that he be monitored by U.S. Probation Services and pay for monitoring service.

## LEGAL STANDARD

The Court may not modify a defendant's sentence once imposed, except in limited circumstances. *Dillion v. United States,* 560 U.S. 817, 819 (2010). Congress provided for a "compassionate release" exception in 18 U.S.C. § 3582(c)(1)(A).

The Court may grant release if it finds (1) the defendant exhausted administrative remedies available in the BOP, 18 U.S.C. § 3582(c)(1)(A); (2) the defendant's reasons for release are extraordinary and compelling, pursuant to the Sentencing Commission's policy statement, U.S.S.G. § 1B1.13(b); and (3) the factors in 18 U.S.C. §3553(a) weigh in favor of a sentence reduction.

The defendant bears the burden of showing that "extraordinary and compelling reasons warrant such a reduction" under U.S.S.G. § 1B1.13(b). The

---

[1] At sentencing, the Court ordered, as a condition of supervision:

> The defendant will not be employed in any capacity related to billing, receiving money, conducting wire transfers, providing investment advice, trading in the stock and commodities market for others, or given fiduciary responsibility of any kind, nor shall he perform any unpaid or volunteer activities in this area during the term of supervised release without the permission of his probation officer.

Dkt. 748 at 61.

MEMORANDUM DECISION AND ORDER - 2

current policy statement definition of "[e]xtraordinary and compelling reasons"
includes serious issues with the defendant's health or an immediate family
member's need for care, suffering from serious effects of aging, and other
unspecified reasons "similar in gravity" to the reasons stated in the Guidelines.
U.S.S.G. § 1B1.13.

The consideration factors of 18 U.S.C. §3553(a), in pertinent part, include:

> (1)     the nature and circumstances of the offense
> and the history and characteristics of the defendant; [and]
> (2) the need for the sentence imposed— (A) to reflect the
> seriousness of the offense, to promote respect for the law,
> and to provide just punishment for the offense; (B) to
> afford adequate deterrence to criminal conduct; (C) to
> protect the public from further crimes of the defendant;
> and (D) to provide the defendant with needed educational
> or vocational training, medical care, or other correctional
> treatment in the most effective manner.

Compassionate release is not simply a change of location for a sentence to
be served, but an actual sentence reduction; however, the defendant is subject to
return to prison upon a violation of any terms of supervision. *United States v.
Flenory*, 841 F. App'x 971, 973 (6th Cir. 2021) (unpublished); *Rahman v. Williams*,
No. 21-CV-01801-LTB-GPG, 2021 WL 11697533, at *3 (D. Colo. Aug. 16, 2021),
*report and recommendation adopted*, No. 21-CV-01801-LTB-GPG, 2021 WL
11697506 (D. Colo. Sept. 7, 2021).

MEMORANDUM DECISION AND ORDER - 3

Home detention is defined as "a program of confinement and supervision that restricts the defendant to his place of residence continuously, except for authorized absences, enforced by appropriate means of surveillance by the probation office." *United States v. McWherter*, No. 15-20040, 2020 WL 6469936, at *2 (E.D. Mich. Nov. 3, 2020).[2]

When a court grants a sentence reduction under the compassionate release statute, it "may impose a term of ... supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." 18 U.S.C. § 3582(c)(1)(A). Under the compassionate release statute, federal courts have concluded it is lawful to add or modify a term of supervised release to contain a period of home detention as a condition of supervised release, so long as the court finds that home detention is a "substitute for imprisonment" under U.S.S.G. § 5F1.2 and 18 § 3583(e)(2).

For example, addressing a defendant's claim that the law did not permit an additional term of home detention to be added to his supervision conditions, the United States Court of Appeals for the Tenth Circuit reasoned and concluded:

> Mr. Ivory claims, "the district court erred when it added an additional 'special term' of 60 months home confinement, because the court lacked jurisdiction." Aplt. Br. at 5. We discern no error. As discussed, the

---

[2] In contrast, *home confinement* is merely a change in the location of incarceration, governed by § 3624(g)(2)(A), subject to revocation and return to prison under § 3624(g)(5) (with the Bureau of Prisons having exclusive authority to order it under § 3624(c)(2)).

MEMORANDUM DECISION AND ORDER - 4

compassionate release statute allows courts to impose supervised release "with or without conditions" when a defendant receives a reduced sentence. § 3582(c)(1)(A). As long as the supervised release term "does not exceed the unserved portion of the original term of imprisonment" and the court considers the § 3553(a) factors, the court has the authority to impose it. Id. Home confinement is a permissible condition of supervised release if it is an alternative to incarceration. 18 U.S.C. § 3583(e)(4) ("The court may ... order the defendant to remain at his place of residence during nonworking hours ... as an alternative to incarceration."). The advisory Sentencing Guidelines also state "[h]ome detention may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment." U.S.S.G. § 5F1.2.

*United States v. Ivory*, No. 22-3094, 2023 WL 4488193, at *4 (10th Cir. July 12, 2023). *See also United States v. Simon*, No. 20-6701, 2022 WL 337126, at *1 (4th Cir. Feb. 4, 2022) ("[I]f the district court found home confinement to be appropriate, the court could have granted the motion for compassionate release and imposed home confinement as a term of supervised release."); *United States v. Dragone*, No. 3:16cr30 (JBA), 2021 U.S. Dist. LEXIS 17980, at *4 (D. Conn. Feb. 1, 2021) (granting motion for compassionate release, reducing sentence to time served, and ordering defendant to be released to home detention); *United States v. Ciprian*, No. 1 Cr. 1032-74 (PAE), 2021 U.S. Dist. LEXIS 18698, at *12 (S.D.N.Y. Feb. 1, 2021) (granting compassionate release and, as a condition of supervised release, ordering defendant to spend the first six months of release in a halfway house or in home detention); *United States v. Gilchrist*, No. CR 12-20066-40-KHV,

MEMORANDUM DECISION AND ORDER - 5

2025 WL 55301, at *2 (D. Kan. Jan. 9, 2025); *United States v. Peace*, No. 8:08-CR-00628-DCC-6, 2025 WL 1400438, at *5–6 (D.S.C. May 14, 2025); *United States v. Smith*, No. CR 12-20066-31-KHV, 2023 WL 8545332, at *2 (D. Kan. Dec. 11, 2023)("Consistent with these statutes and because the Court lacked authority to order the Bureau of Prisons to transfer defendant from prison to home confinement, the Court imposed the special term of 54 months of supervised release with a condition of home confinement as a substitute for defendant's remaining prison term."); *United States v. Brooks*, No. 07-CR-20047-JES-DGB, 2020 WL 2509107, at *6 (C.D. Ill. May 15, 2020).

## BACKGROUND

Swenson is an inmate currently incarcerated at FMC-Devens in Massachusetts. In 2014 he was found guilty of 73 counts of security fraud and wire fraud and sentenced to 20 years in prison. Dkt. 748 at 59-60. He was on release pending appeal between 2014 and 2018, and he reported to prison on July 10, 2018. He has served approximately 7 years or 35 percent of his sentence. Swenson's projected release date is July 24, 2034. Dkt. 1114 at 6.

On May 25, 2024, while incarcerated at FC-Englewood in Colorado, Swenson contracted necrotizing fasciitis on his abdomen and groin area, an aggressive form of staph infection commonly referred to as "flesh-eating disease." BOP medical staff were slow to recognize the severity of Swenson's symptoms,

MEMORANDUM DECISION AND ORDER - 6

mostly because there was no doctor on staff at the prison. Swenson was taken to the hospital four days later.

Necrotizing fasciitis has a mortality rate of 25% to 35%. Swenson was told by his doctor at the hospital that if the BOP "had waited just one additional day" to bring him in, "he would have died." *See* Dkt. 1105-1 at 4.

For the next 34 days, Mr. Swenson remained on bedrest, first at the hospital and then at a rehab center. Five surgeries were required to save his life. "The initial procedure involved surgically opening the affected area to remove dead and infected tissue," from his left groin, the wound "measuring approximately 20 by 10 centimeters and 3 centimeters deep." *Id*. In each subsequent surgery, the wound was expanded, eventually covering not just the groin, but extending to Mr. Swenson's "perineal area," (the area between the "base of the scrotum" to his "anus"). *Id*. Some of Mr. Swenson's abductor muscles were then harvested to create a flap to protect the wound while it healed. *Id*.

Swenson asserts that, generally, survivors of this disease often have "persistent disabilities," as well as "significantly decreased physical, social, and emotional functioning." Dkt. 1105-1 at 20. In addition, they can experience "ongoing pain[,] [d]epression and post-traumatic stress." *Id*. Therefore, post-survival treatment requires "[l]ong-term multidisciplinary care, including physiotherapy and psychotherapy ... to help patients adjust to their functional

MEMORANDUM DECISION AND ORDER - 7

impairments and changed body appearances." *Id*. at 5. Swenson has not asserted that he requested these services and was denied access to them, nor has he articulated any particular need for these type of services.

Staff at FC-Englewood did not follow many of the post-operative instructions to aid in healing and prevention of further infection. Dkt. 1105-1 at 5-6. In addition, during several transfers between prisons, Swenson was deprived of prescription medication, over-the-counter medication, food, and water. Dkt. 1105-1 at 6-10. On November 5, 2024, Swenson was transferred to FMC-Devens, a medical center for inmates requiring specialized or long-term medical care. He was further deprived of medications for 119 days at FMC-Devens when, as is the custom for all newly-arriving inmates, he was placed in a "Special Housing Unit," chiefly used to house inmates with disciplinary issues. Dkt. 1105-1 at 10-11.

Shortly after Mr. Swenson arrived at Devens, the Inspector General of the Department of Justice released a report about the status of medical care at FMC-Devens, identifying "several serious issues at FMC Devens related to staffing, inmate healthcare quality, infrastructure, inmate programming, failure to complete rounds, and radio system deficiencies." Dkt. 1105-1 at 10. Despite having over 1,000 inmates at the "medical center"—many of which were transferred there specifically because they needed long-term or specialized medical care—the report found that Devens had "only one physician at the institution to provide daily patient care." *Id*.

MEMORANDUM DECISION AND ORDER - 8

Full staffing requires six doctors. Approximately a quarter of the prison's nursing positions were vacant, as were half of its pharmacy positions. *Id*. The Inspector General characterized these deficiencies as a "staffing crisis," noting the shortage had "cascading effects on [FMC-Devens'] ability to care for its inmates … limit[ing] the quality and quantity of medical services it can provide." *Id*.

Today, FMC-Devens has complied with many of the requirements to bring its standard of medical care up to community and BOP standards. *See* Dkt. 1114 at 17-18. However, it appears that only two doctors staff the medical center, with two additional doctors in the hiring process. That still equals only two doctors for approximately 1,000 inmates. *See* Dkts. 1105-1; 1114 at 17-18.

In January 2025 Swenson had been attempting to self-treat blisters on his toes for approximately two weeks (using triple antibiotic ointment, but no band-aids were available at the commissary). On February 4, 2025, Swenson's lower left calf began to swell. When he was able to see a nurse on February 6, 2025, he was rushed to the hospital, because these were the same symptoms that were precursors to his last bout of necrotizing fasciitis. He was diagnosed with cellulitis, a staph infection caused by the same bacteria that causes necrotizing fasciitis, staphylococcus aureus. Dkt. 1105-1 at 12-13, 15. After Swenson returned from the hospital, the infection continued to spread, and prison doctors treated him with IV-administered antibiotics. Dkt. 1105-1 at 13. On March 5, Nurse Practitioner (NP) Adams inspected the infected area and

said she thought more treatment was needed. Swenson did not see NP Adams until March 11, when she ordered oral antibiotics. Dkt. 1105-27 at 5.

Dr. Benson Pulikkottil performed two of the five surgeries on Swenson and conducted post-operative care until the BOP transferred Swenson out of Colorado. Swenson has provided the Affidavit of Dr. Benson Pulikkottil, who notes: "Individuals who have previously contracted necrotizing fasciitis are at a higher risk of reinfection, particularly in prison settings." Dkt. 1105-1 at 18. Swenson cites to a study by the National Institute of Health finding that nearly 60% of all male inmates have been colonized by one or more strains of staph. And the BOP itself has admitted that "[t]reatment to eliminate colonization ... is not routinely recommended" due to "the lack of definitive evidence to support decolonization within the correctional environment." Fed. Bureau Prisons, *Management of Methicillin-Resistant Staphylococcus aureus (MRSA) Infections, Federal BOP Clinical Practice Guidelines* 7, (Apr. 2012), https://tinyurl.com/5n79mava. Dkt. 1105-1 at 19. Dr. Pulikkottil opined that "Mr. Swenson's compromised health status due to multiple medical conditions and the invasive nature of his surgical treatments" put him "at an increased risk of reinfection." *Id*. at 18. While the Government argues that there is no evidence of an "outbreak" of staph infection at the prison facility, it is not simply an "outbreak" that threatens Swenson's health, it

MEMORANDUM DECISION AND ORDER - 10

is that he is surrounded by and touched by carriers of staph bacteria at the prison much more often than if he were alternatively imprisoned under home detention.

In addition to the infectious disease issues, Swenson's kidneys are deteriorating. Mr. Swenson suffered an acute kidney injury as a secondary consequence of necrotizing fasciitis. *See* Dkt. 1105-1 at 5 (citing, incorrectly, Ex. 238J; correct exhibit, 368J). On November 19, 2024, Mr. Swenson's chronic kidney disease was rated at "stage 4 (severe)." Dkt. 1105-12 (Ex. 8J). Dr. Diane Turner notes: "In the last 4 years his kidney function has significantly deteriorated from Stage 3a-b to Stage 4. The next stage of kidney disease is where dialysis becomes imperative to sustain life. He needs to be carefully and frequently monitored for kidney deterioration to avoid the risk of death." Dkt. 1105-1 at 23.

Dr. Turner also recommends: "Lifestyle modifications ... are necessary to reduce the risk of progression to Stage 5 [Chronic Kidney Disease]." Dkt. 1105-1 at 23. These include "1) Dietary Modifications with guidance from professional dieticians trained in renal disease; 2) Physical Activity compatible with cardiovascular health to include a minimum of 30 minutes of moderate intensity exercise five times a week; and 3) Weight Management with maintaining an optimal body mass index." *Id*. FMC-Devens health care providers have reduced Swenson's creatinine levels from 2.77 to 1.9 (1.3 is considered normal). Dkt. 1114 at 11-12.

MEMORANDUM DECISION AND ORDER - 11

In addition, Swenson suffered a heart attack in prison. Dkt. 1105-1 at 25. Clearly, beyond the infectious disease issues, Swenson's body is in a state of decline.

## ANALYSIS

### 1.  Exhaustion Requirement

First, the exhaustion requirement must be met. 18 U.S.C. § 3582(c)(1)(A). The record reflects that Swenson has exhausted his administrative remedies by making the prerequisite request to his BOP warden and following through with an appeal. Dkt. 1105-1 at 12. The BOP issued its final denial on January 21, 2025. *Id.* The Court concludes that Swenson properly exhausted his administrative remedies.

### 2.  Extraordinary and Compelling Reasons

Second, the petitioner must show extraordinary and compelling reasons to support a compassionate release. Mr. Swenson asserts that release is appropriate for the following reasons listed in the policy statement—

- When the defendant is housed at a correctional facility affected or at imminent risk of being affected by ... an ongoing outbreak of infectious disease" which cannot be mitigated in a timely fashion and which places "the defendant ... at increased risk of suffering severe medical complications or death." U.S.S.G. § at 1B1.13(1)(D);

- When the "defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death," *id*. at 1B1.13(1)(C); or

MEMORANDUM DECISION AND ORDER - 12

- When the defendant is "experiencing deteriorating physical or mental health because of the aging process ... that substantially diminishes the ability of the defendant to provide selfcare within the environment of a correctional facility and from which he ... is not expected to recover," *id*. at 1B1.13(1)(B).

The Court concludes that Swenson's conditions meet the first two reasons, as it will now explain.[3]

## A. *Risk of Contracting an Infectious Disease*

As noted above, the levels of staph bacteria normally found in inmates, correctional staff, and medical staff at a prison are much higher than in the community at large. *See* Dkt. 1105-1 at 15-16. In addition, inmates are constantly subjected to being touched by correctional staff for security pat-downs, placement of handcuffs, and other security measures. *Id*. at 16. Compared to isolating Swenson in his daughter's home, the risks of him contracting another potentially fatal staph infection are much higher in the prison setting.

---

[3] Mr. Swenson asserts his health is rapidly declining due to age. He is 76 years old and suffers from age-related ailments including hypertension, hypothyroidism, hyperparathyroidism, obesity, and pre-diabetes, none of which he is "expected to recover" from and all of which complicate his ability to provide "self-care within the environment of a correctional facility." U.S.S.G. 1B1.13(1)(B). But the Government's briefing and provision of Swenson's recent medical records show that he is faring relatively well at this time. Swenson reported to health professionals as recently as March 18, 2025, that he was feeling better with increased energy allowing him to walk up the BOP compound without stopping. Dkt. 1114 at 2. There is no indication he is having difficulty with self-care at this time.

MEMORANDUM DECISION AND ORDER - 13

## B. *Serious Physical Conditions*

Swenson's conditions of necrotizing fasciitis, cellulitis, kidney issues, and a recent heart attack all qualify as serious physical conditions. They require significant ongoing monitoring, and, at times, immediate hospitalization. Consistent understaffing of BOP medical facilities puts Swenson at risk of not receiving timely care that is required to prevent further injury and death.

While BOP medical providers report that Swenson is doing relatively well at this point, the Court is concerned that the totality of Swenson's medical history shows he requires immediate emergency care when his infectious diseases return, and his treating specialist says the diseases are likely to recur. Doctor and health care provider understaffing was one of the main reasons Swenson's infectious diseases were not promptly treated—necrotizing fasciitis (delay of four days), initial cellulitis infection (delay of two days), prescription of oral antibiotics to treat an ongoing infection (delay of six days). The record reflects that, when Swenson has a serious health incident, prison staff are not able to provide sufficient follow-up care, compliance with outside doctors' recommendations, or aid in helping care for Swenson's self-care. Swenson needs exacting, detailed, immediate care, including in diagnostics, prevention, and post-hospital care. The record clearly reflects that he does not receive this level of care in prison.

### 3. Section 3553(a) Factors

Compassionate release is appropriate when the § 3553(a) factors (1) and (2)(A) through (D) weigh in favor of release. Factor (1) is "the nature and circumstances of the offense and the history and characteristics of the defendant." § 3553(a). Mr. Swenson is a first-time, non-violent offender. He was "committed to his family, committed to his church, committed to his community." Dkt. 748 at 58. He served for years as a volunteer Boy Scout leader and little league baseball coach. The Court acknowledged that Swenson was "someone who contributed a great deal to his neighbors, his family, his friends." Dkts. 748 at 58, 67; 1105-1 at 27. These subfactors weigh in favor of release.

In contrast to these commendable characteristics, Swenson's business dealings were far from community-minded. His goal was to become a billionaire on the backs of middle-class investors. He took more than $180,000,000 from 1,300 people to fund his personal financial goal, knowing that the company lured them to invest by false representations. Swenson took home income of approximately $26 million from 2000 to 2008. Dkt. 748 at 58-59; Dkt 747 at 33. He commissioned an architect to build two mansions for himself: one in McCall and one on the Boise River in Eagle; one of these was to be 15,000 square feet. Dkt. 748 at 59. These subfactors weigh against release.

MEMORANDUM DECISION AND ORDER - 15

DBSI acted like a Ponzi scheme, relying on new investor funds to continue operations and pay returns to other investors. However, in late 2008, when DBSI could not sell new investments, DBSI collapsed, and Swenson's crimes were exposed. The prosecutor described the DBSI scheme as "the largest fraud ever committed in the District of Idaho." Dkt. 748 at 10. These subfactors weigh against release.

There is a large restitution payment due, $180,632,025. (ECF No. 816.) The potential for victims to receive restitution if Swenson is released weighs in favor of compassionate release.

Factor 2(A) is the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

Because Swenson's crime was premeditated and intentional, and had a tremendous impact on the victims, the Court concluded at sentencing that a 20-year sentence was "reasonable and just" punishment. Dkt. 723 at 52-53, 57. The Court observed that Swenson's crime caused the victims "staggering" losses and catastrophic consequences, disproportionately affecting older investors and retirees, who had to return to the workforce because their retirement savings were squandered by Swenson. *See* Dkt. 748 at 59.

MEMORANDUM DECISION AND ORDER - 16

The Court finds that a three-year reduction of sentence with a period of home detention as a condition of supervised release would adequately reflect the seriousness of the offense and the seriousness of the resulting punishment. Under these circumstances, the overall time during which Swenson's liberty is constrained will still constitute a substantial portion of the overall sentence initially imposed. *See* 18 U.S.C. § 3582(c)(1)(A).

Factor 2(B) is the need for the sentence imposed to afford adequate deterrence to criminal conduct. At sentencing, the Court observed that deterrence for others weighing whether to engage in white-collar crime was served by *some* length of imprisonment for Swenson:

> I think that is some indication that, indeed, that in the boardrooms of America and on the – that there are decisions made that are impacted by whether people go to prison or not when there is fraudulent conduct. In a high-profile case like this one, I think the message given by the court's sentence, whether that sentence is short or long, I think is probably magnified in terms of its deterrent effect.

Dkt. 732 at 56.

Further, Swenson will be required to comply with the new and old conditions of supervised release. If he does not, he will be back in prison. Overall, Factor 2(B) weighs in favor of release.

Factor 2(C) is the need for the sentence imposed to protect the public from further crimes of the defendant. Swenson's advanced age, his health issues, his

MEMORANDUM DECISION AND ORDER - 17

home detention, his limitation on paid and volunteer work, and his other supervisory conditions make him a lower risk to the community. The Court has confidence that U.S. Probation Services can craft a supervision plan to ensure that Swenson does not place himself in a position to commit fraud in the future. This factor weighs in favor of release.

Factor 2(D) is the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. Swenson already has sufficient educational training to be gainfully employed, and he is more likely to find helpful resources to educate himself on business ethics outside of prison. The specialized medical care he needs is more available outside prison. This factor weighs in favor of release.

### 4. Conclusion

Sufficient evidence shows that the BOP is not staffed to provide Swenson immediate necessary medical care to address his recurring infectious disease issues. Earlier this year, Swenson came close to death as a result of delay due to understaffing. While his crimes are deplorable and caused many people monetary injury (likely with attendant mental and emotional suffering), death is not among the punishments for fraud. Swenson's treating doctor has declared that necrotizing fasciitis is likely to recur, and the Government has not shown otherwise. Similar to another court's reasoning taking into consideration the height of the past COVID-

19 pandemic as a factor contributing to a compassionate release, the Court agrees that "[a] day spent in prison … in fear of contracting a deadly [infection] exacts a price on a prisoner beyond that imposed by an ordinary day in prison." *Ciprian*, 2021 U.S. Dist. LEXIS 18698, at *8.

The Court finds Swenson meets the U.S.S.G. § at 1B1.13(1)(C)&(D) criteria for early release, notwithstanding the fact that, currently, his medical conditions seems stable. The civil rights law principle that  an inmate "does not have to await the consummation of threatened injury to obtain preventive relief" applies here by analogy, given that Swenson has provided three recent examples of delayed care for his infectious disease issues. *See Farmer v. Brennan*, 511 U.S. 825, 827 (1994) (internal citations, punctuation, and alterations omitted). Outside of prison, he will have quicker and better access to emergency services and  medical specialists.

The Court also finds the factors in 18 U.S.C. §3553(a) weigh in favor of a sentence reduction. While the Court concludes that Swenson's character is a mixed bag, he is not likely to re-offend and he would be able to begin restitution payments. Swenson's long sentence and subsequent supervision period will continue to reflect the serious nature of his crimes and provide a deterrent effect for others contemplating white-collar crime. Serving the remainder of the 17-year total sentence in home detention as punishment still reflects the seriousness of his offense.

MEMORANDUM DECISION AND ORDER - 19

Accordingly, the Court will also add the following condition to Defendant's

term of supervised release:

> You will be placed on home detention to be monitored by a form of location monitoring technology during home detention, and you must follow the rules and regulations of the location monitoring program. The location monitoring technology used will be at the discretion of the United States Probation Office. While on home detention, you are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities as pre-approved by your supervising officer, but because the home detention is considered punishment, "other activities" should be curtailed to reflect that home detention is another form of incarceration. For example, activities such as attendance at family parties, church get-togethers that are not solely for worship, family reunions, community events, vacations, cruises, and non-family funerals shall not be permitted. You must contribute to the cost of such monitoring program not to exceed the amount determined reasonable by the United States Probation Office.

> As your health permits, you should work and pay restitution to your victims; and

> Your supervisor will ensure that any job you undertake does not provide you with opportunity to commit the same type of criminal actions for which you are currently imprisoned;

All other conditions of supervised release shall remain the same.

MEMORANDUM DECISION AND ORDER - 20

# ORDER

**IT IS ORDERED:**

1. Defendant Douglas Swenson's Motion for Compassionate Release (Dkt. 1105) is **GRANTED**, with the conditions set forth in this Order.

2. Swenson's term of imprisonment is reduced to 17 years total.

3. As part of his punishment, Swenson shall serve the remainder of his 17-year sentence in home detention period during a newly-imposed supervision term; after that, Swenson must serve his original 3-year term of supervised release (not subject to home detention).

4. This Order is stayed for up to 21 days, while Swenson's counsel coordinates transportation of Swenson to Idaho with the BOP and with Probation Services. A home monitoring system must be in place before Swenson is released.  Swenson shall be released  as soon as a residence is verified, a release plan established, appropriate medical and travel arrangements made, and BOP health care providers determine it is safe for Swenson to travel. If more than 21 days are needed to accomplish these tasks, the parties shall immediately notify the Court and show cause why the stay should be extended.

MEMORANDUM DECISION AND ORDER - 21

5. All conditions of supervised release from the Judgment (Dkt. 723) shall remain in effect, together with those new conditions set forth herein.

6. Defendant's Motion to File Excess Pages (Dkt. 1116) is **GRANTED**.

DATED: July 29, 2025

B. Lynn Winmill
U.S. District Court Judge